Filed 6/12/15  P. v. Oudin and Gibbs CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>JAMES CHARLES OUDIN AND WESLEY ELWIN GIBBS,<br><br>    Defendants and Appellants. | G050682<br><br>(Super. Ct. No. INF1101884)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, James S. Hawkins, Judge.  Affirmed.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant James Charles Oudin.

Mark David Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant Wesley Elwin Gibbs

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants James Charles Oudin (Oudin) and Wesley Elwin Gibbs (Gibbs) of first degree special-circumstance murder for financial gain, and the court sentenced them to life without the possibility of parole. Oudin and Gibbs (defendants) assert: (1) dog scent trailing evidence was improperly admitted; (2) the jury should have been instructed to view the dog scent trailing evidence with caution; (3) eyewitness identification evidence was improperly admitted; (4) trial counsel rendered ineffective assistance; (5) a new trial motion should have been granted; (6) the scent dog was improperly allowed into the courtroom; and (7) cumulative error. None of these assertions has merit, except the scent dog was improperly allowed into the courtroom, and we conclude that error was harmless. Therefore, we affirm the judgment.

**FACTS AND PROCEDURAL HISTORY**

*Trial Evidence*

Judy Munson, the 69-year-old victim, was Oudin's sister. Munson owned a successful janitorial cleaning service and lived alone in a gated community in La Quinta. Oudin and his wife, Madelyn Oudin (Madelyn), lived in the Lakewood home of Constance Norrington, Madelyn's mother.

On June 11, 2011, around 1:00 p.m., Munson's housekeeper, Blanca Pina, found Munson lying on the living room floor, her head in a pool of blood. Pina screamed and told her daughter to call 911. Several of Munson's neighbors, including Vera Chernick, ran over and attempted to render aid, but it was too late.

Police and emergency personnel arrived at Munson's home around 1:40 p.m. They found Munson's body on the floor. There was blood splatter on her face, and on the door to her home office. Her bedroom had been ransacked—dresser drawers were open and clothing and jewelry were strewn about. There was $2,500 cash in an envelope on her bed next to her passport. A purse lying on the kitchen counter also contained a large amount of cash.

2

A deputy coroner conducted an examination of Munson's body at the scene, and initially ruled Munson's death an accident. There was a laceration on her forehead, but no other external signs of trauma.

Around 6:00 p.m., a Riverside County Sheriff's deputy advised Oudin of his sister's death. Later that day, the coroner released the $2,500 found on Munson's bed and her other personal effects to Oudin.

A biohazard cleaning company came to Munson's home the following morning. While the cleaners were working, they discovered a bloody fingerprint on a doorjamb and a blood smear on a filing cabinet.

Two days later, a pathologist performed an autopsy and found Munson had three skull impacts, one to her forehead and two to the back of her head. The wounds had a cross hatch pattern found on some hammers. The pathologist concluded Munson died as a result of blunt force cranial-cerebral trauma and ruled Munson's death a homicide.

The Riverside County Sheriff's Department opened a homicide investigation, and a forensic technician went to Munson's home. As noted, the home had been cleaned, but the technician used a chemical agent that revealed the presence of blood on the tile in front of Munson's home office, on the office door frame, in the bathroom nearest the office, on the kitchen sink, and on a towel in the laundry room.

On June 13, Riverside County Sheriff's Detective Kenneth Patterson called Oudin to tell him Munson's death was now considered a homicide. Patterson talked to both Oudin and Madelyn. The call was recorded.

After Patterson told Oudin his sister's death had been ruled a homicide, Oudin told Patterson that in the weeks preceding her death, Munson said someone had followed her from the bank on three occasions. According to Oudin, Munson described the individual as a male in his mid-40's to early 50's with sandy brown hair. Oudin also volunteered that Munson always carried a lot of cash, and she had planned to leave for Italy on June 12.

3

Without any prompting, Oudin also told Patterson that 40 years earlier he had been hit on the head with a hammer and robbed. The assault, he said, had caused him to become paralyzed and forced him to use a walker or wheelchair. Patterson considered Oudin's statement "totally out of place" and it caught his attention.

Patterson asked Madelyn if Munson kept a safe in her home. Madelyn said Munson did have a small safe, but Madelyn and Oudin had already removed the safe and jewelry from Munson's home because the back door was broken.

The following day, Oudin and Madelyn came to the sheriff's station for a video-recorded interview. Oudin told Patterson he was shocked Munson had been murdered. He mentioned his previous robbery experience, again. Patterson explained to Oudin that he believed the crime was premeditated murder and not a robbery gone awry.

To Patterson, Oudin seemed "bland." Patterson also found it odd Oudin volunteered he had every visitor's pass he had ever been given to enter Munson's gated community. Oudin said he had not been to her house for several days before the murder.

When Patterson left the interview room, Oudin told Madelyn they needed "to look for that safety box," and they had the following exchange: "MADELYN: I told him that the company was worth two million dollars. [¶] OUDIN: Really? [¶] MADELYN: I don't know. [¶] OUDIN: I mean it'll be worth two million dollars. But you gotta get a company. [¶] MADELYN: If it could be purchased. [¶] OUDIN: Is the contract [s]till thirty days? [¶] MADELYN: So that it makes it look like we did it then. [¶] OUDIN: Did what? [¶] MADELYN: Cause we're beneficiaries of the company."

The next day, Patterson talked to Chernick. She had seen an unfamiliar light colored sedan parked in front of Munson's home around 2:00 p.m. on June 10. She had also seen a stocky man in his 30's or 40's standing near Munson's house while an older man with a walker got out. She watched them walk to Munson's front door and then she turned around and went about her business. She was never able to identify either of the men, although the police showed her a couple of photographic lineups.

4

Patterson also talked to the gate guard who had been on duty June 10. He told Patterson that Oudin was not on Munson's permanent visitor list, which meant Oudin needed a pass to enter. The guard also said all vehicles given visitor passes were supposed to be documented. However, Patterson observed the guard would most often wave a familiar vehicle through the gate without issuing a pass.

As Patterson was leaving Munson's neighborhood that day, he noticed Madelyn and Oudin were at Munson's home, loading some of her furniture in a truck.

Some days later, police obtained surveillance videos from a shopping center near Munson's home. The videos showed Munson was in the shopping center on June 10, from 11:30 a.m. to 1:30 p.m. She was seen entering a nail salon and a CVS Pharmacy, and she was wearing the same clothing later found on her body. Also, at 12:30 p.m. that day, a white Chrysler Pacifica was parked in front of the nail salon. Oudin and Madelyn's only car at the time was a white Chrysler Pacifica.

During the next few days, the police learned Oudin was not in Lakewood as he claimed on the day Munson was killed. In fact, by following a trail of cell phone tower pings, police learned Oudin had made a round trip from his home in Lakewood to Munson's house in La Quinta and back on June 10. Between 11:07 a.m. and 11:42 a.m. his phone had also pinged off a tower adjacent to the shopping center where Munson got her nails done. Around 1:00 p.m., Oudin called Munson, but he made no other calls until 6:02 p.m. when he called Madelyn. That call pinged off a tower east of Corona.

On June 22, Patterson interviewed Oudin and Madelyn at their Lakewood home. Patterson first talked to Oudin. After he and Oudin revisited Oudin's prior statements concerning his whereabouts on the day Munson died, Patterson told Oudin the cell phone records indicated he had been in La Quinta and not Lakewood. Oudin admitted he had been in La Quinta, but claimed he looked at a restaurant and did not stop to see Munson. Oudin explained he had talked to Munson on June 10 about this restaurant, because he wanted her to help him buy it.

5

Oudin said he was supposed to have looked at this restaurant the day before so he had lied to Munson about having looked at it. The following morning, Oudin drove to La Quinta to look at the restaurant and then came home. He claimed he did not tell police about this earlier because he did not have a driver's license.

Patterson told Madelyn that Chernick claimed to have seen an older man with a walker and a younger man outside of Munson's house on the day she died. Madelyn blurted out, "That would have been Wes."

Oudin told Patterson that Madelyn was referring to Gibbs, who was one of his son Jason Oudin's (Jason) friends, but said he did not know Gibbs well. Oudin also told Patterson the last time he had seen Gibbs was two weeks before Munson's death.

Patterson obtained a warrant for Gibbs's cell phone records. Between June 1 and June 7, there were 33 calls between Gibbs and Oudin. On June 8, a call from Gibbs to Oudin was relayed from a tower in Lakewood. On June 9 and June 10 Gibbs made several calls to other people living in Lakewood.

On June 11, Gibbs made a call from Lakewood at 6:53 a.m. and another from Hesperia at 12:53 p.m. Also on June 11, three calls between Oudin and Gibbs were traced along a round trip route from Lakewood to La Quinta. And, there was a flurry of calls between them on June 22, the day Patterson interviewed Oudin and Madelyn.

On July 7, Patterson found Gibbs in Hesperia. Gibbs told Patterson he met Jason in 2002 when they lived in Arizona. Gibbs was a mechanic and he helped Jason work on his truck. Over time, they became friends. Eventually, Gibbs became a cook in the Oudin's restaurant and he worked there until it closed in 2010.

Gibbs met Oudin through the restaurant and his friendship with Jason. Gibbs and Oudin were hoping to buy a restaurant together, and they met a couple of times a week to scout various sites. Gibbs had only seen Munson three times, twice in the family's restaurant and once in Lakewood about two weeks before Munson's murder. On the last occasion he saw Munson, Gibbs had asked her for a job.

6

Gibbs denied being with Oudin on June 10, and denied being at Munson's house. He said he had never been to La Quinta. Furthermore, Gibbs said he had not been to Palm Springs since 1989.

When Patterson told Gibbs his phone records indicated he was in Lakewood on June 10, Gibbs insisted he was not. Later, Gibbs admitted being in Lakewood on June 10, but he denied going anywhere with Oudin.

The same day, police searched Oudin and Madelyn's home. In Norrington's bedroom, they found a black purse containing $409,200 in a case, divided into units of $10,000 each. Madelyn said the money belonged to Munson.

As the investigation progressed, Patterson learned from Munson's former neighbors that Oudin and Madelyn were frequently at Munson's home and expressed the desire to move into it. Madelyn started to drive Munson's cars. Oudin assumed the management of Munson's business and hired Gibbs.

On June 24, Oudin filed letters of administration regarding Munson's estate. Oudin alleged Munson died without a will, and he sought appointment as the administrator of an estate he claimed was worth $400,000.

However Munson had a will, which stated she wanted the business sold and the assets distributed to the beneficiaries of her trust. She made no provision for Oudin.

Paul Taggart, the executor under Munson's will, successfully opposed Oudin's appointment as administrator. Taggart demanded Oudin return Munson's property, but Oudin refused. Taggart estimated Munson's assets to be at least $1,000,000. He said she kept $50,000 in a safe in her home, and $400,000 to $600,000 in a case in a safe deposit box. Moreover, he estimated Munson's business should have had "maybe a quarter of a million dollars of cash" in the bank.

On June 30, the police obtained an order freezing Munson's bank accounts. Oudin then formed another company, and solicited Munson's former clients to make payments directly to his new company.

7

In July, Gibbs traveled to Needles to visit one of his sons. Although he had never paid child support before and did not own a car, Gibbs paid $200 for a motel room and brought gifts for his son. He told his son's mother, Elizabeth Sandoval, he had paid some outstanding fines affecting his driver's license, and planned to buy a truck.

When Sandoval asked Gibbs if Oudin had loaned him some money, Gibbs replied, "something like that." Later, two of Gibbs's other sons would say they saved the money to pay for their father's fines, but Gibbs did not say that to Sandoval. Moreover, Gibbs told Sandoval he was going to be the vice-president of Oudin's company.

On August 8, Patterson contacted Corporal Todd Garvin, a Riverside County Sheriff's Department canine deputy. Patterson asked Garvin to prepare scent samples from the shirt Munson had been wearing at the time she was murdered.

Garvin retrieved the shirt from the evidence room, and placed two sterile gauze pads on top of the shirt. After a couple of minutes, Garvin removed the scent pads and put them into separate sealed plastic bags.

On August 10, Patterson learned Gibbs would be at a San Bernardino County Sheriff's substation in Needles for a supervised visit with his son. Patterson called Garvin to the sheriff's substation, with his bloodhound Inga. Patterson did not give Garvin any details about the scent trailing assignment, Gibbs or his car.

Before Garvin arrived, Patterson and other officers observed Gibbs park his car in the parking lot, get out on the driver's side, stand next to the rear bumper and smoke a cigarette, open a driver's side door, retrieve some paperwork, walk across the parking lot and some grass, up a sidewalk and into the building.

When Garvin arrived in the sheriff's substation parking lot, he took Inga to the edge of a grassy area, presented one of the scent pads to her, and told her to "Find'em." Inga circled the area, with her nose to the ground, and trailed towards where Gibbs's car was parked. She pulled Garvin to Gibbs's car, and sniffed the back bumper, driver's door and door handle.

8

Inga led Garvin across the parking lot and passed a sidewalk, but she signaled to Garvin that something had changed. Inga turned around and headed for an outdoor atrium area. Once they were in the atrium, Inga became very excited, jumped over a planter, and pulled Garvin to the doors of the building. Inga sat down in front of the closed doors and put her head back, which Garvin testified means the trail is here.

Garvin opened the door, which lead to a waiting area where there were five people including, Gibbs, his son, a uniformed officer and two plain clothed officers. Inga became excited and sniffed every person in the waiting room. When she came to Gibbs, Inga circled, sat down in front of him, wagged her tail and put her paw on his arm. Garvin stated Inga's actions indicated to him the trail had ended. Gibbs was arrested.

On August 16, Gibbs called Jason from jail. Jason told Gibbs he should have stayed away from Oudin because he "knew something bad was gonna happen." Gibbs wanted Jason to tell Oudin "everything's alright" and he had not "talked to anybody." Jason said he would tell Oudin, and Gibbs replied, "Whatever we were doin', stick to that."

Dr. Lawrence Myers, a practicing veterinarian and associate professor at the Auburn University's College of Veterinary Medicine, testified as a defense expert in dog training, trailing, and handling. Meyers testified that while Garvin and Inga seemed to be a good working team, this would be only observational evidence and not objective.

Meyers stated his primary concern was the potential contamination and degradation of the scent through improper handling, the passage of time, and weather conditions. He also believed it was possible other items in the area where the police stored Munson's shirt could have contaminated the quantity of human scent.

Meyers believed Garvin cued Inga to find Gibbs. He was particularly concerned with how Inga reacted after her first contact with the scent pad. He believed Garvin's anticipation resulted in a reasonably high probability there was "unintentional cuing" by those present where Inga initially cast about for a scent.

9

*Pretrial Dog Scent Trailing Evidence Hearing*

Gibbs made a pretrial motion to "Exclude Dog Scent Evidence," on the grounds the prosecution had failed to establish a proper foundation for its admission at the preliminary examination. Among other things, Gibbs argued: "This is not a traditional tacking [sic] scenario. It is more like a hybrid trailing/lineup. There is no California case on the procedure used in this case. The procedure should have been subjected to *Kelly* [*People v. Kelly* (1976) 17 Cal.3d 24] analysis." Gibbs further argued, "Apart from the *Kelly* rule deficiency in this case, there is a foundational weakness in the dog identification evidence."

In response to Gibbs's motion, the court conducted a lengthy preliminary fact determination hearing (Evidence Code section 402 et seq.) in which the following evidence was adduced. We set forth this evidence in much detail, due to the nature of the questions presented on appeal.

Riverside County's Sheriff's Lieutenant Coby Webb testified she is in charge of their canine unit, and she helped train Garvin and Inga. She began working with canines in 1998, developed the Riverside County bloodhound program in 2004, and had over 3,300 hours of canine training.

Training involves following scents and physical tracks. "[S]cent item[s]" can be almost anything. Trainers place the dog on a leash, offer them a scent item or point them to a track, give the go command, and reward the dog if they find the person. "[T]rack loyal[ty]," or the ability to follow the same scent no matter the distraction is very important and frequently tested.

The bloodhounds are trained to smell a scent item and investigate the area, but if the scent is not present, the dog will sit and not move. As Webb explained, "I can say I have seen [the dog] successful where the handler gets confused because the dog won't go. There's no track that matches the scent item. And that's how we train, and that's how I test to make sure the dog understands."

10

Webb testified her department uses sterile gauze for scent pads. They place the gauze pad on top of a scent item in a plastic bag for a few minutes to allow the pad to absorb the scent. Webb has yet to find a minimum amount of time needed to saturate a scent item, but stated she had seen bloodhounds successfully trail using a scent pad exposed to an item for only a couple of minutes.

Webb does not use scent transfer units, although she is familiar with them. She stated, "I do not understand why I would bring in something else to collect the scent that I don't have proof that it's collecting a scent compared to what I've been successful in and what other agencies have been doing for decades where they have more bloodhounds . . . ."

The handlers do not know whose scent is on a particular item, "[w]hat we know is if the dog can take a trail or not a trail from the scent that's on there." As Webb explained, "I don't know why [this] scent is there. That goes back to investigators. What I can tell you is my dog had a scent from this location that went to this location . . . ." Although not certain, Webb testified her dogs scent range may be as much as a quarter mile.

Webb also explained there is a difference between tracking and trailing. "Tracking is when we do ground disturbance and we have the dog go from footstep to footstep. We . . . have 90-degree turns and the dogs have to . . . do a 90-degree turn and stay on that track." Trailing is when "they don't have to go step for step, they follow scent." But, "there is a nexus between the two," and the dog may be tracking or trailing or both, depending on the circumstances.

Webb testified about cuing, a situation where the dog takes the handler's unspoken messages and body language. She acknowledged that cuing occurs, but she testified procedures for training the dogs and preparing them to trail minimize the risk cuing will occur by giving the dog handler as little information as possible about the reason for the trail.

11

Webb admitted her dogs have made mistakes. However, she stated corroborating evidence like fingerprints, DNA, or the person found matching the description of the suspect in question, confirm the belief that the dogs are able to accurately track and trail. Webb acknowledged Inga was fallible too, but emphasized the errors Inga has made may be attributable to trainer error.

The prosecutor posed the following hypothetical: "Let's assume you get a scent pad from a shirt, a victim's shirt. This – for purposes of our hypothetical, let's assume that there are multiple individuals who have touched that shirt. [¶] The scent pad is taken. It is then taken to a location months after the fact, where the only – there's a suspect who's been identified and the belief is their scent may be on this item. However, anyone else who would have come in contact with that scent item previously are [sic] not present at the location." Webb testified dogs have been able to trail from scent pads that have been stored for long periods of time, and she had one successfully trail an individual from a scent pad that had been sent through the mail.

The prosecutor also asked, "Let's say a shirt is placed in a brown paper sack, as is the norm, that is then sealed and, for purposes of our hypothetical, let's say it's placed in a banker's box and then that item is put into evidence. [¶] Are you concerned that – that a scent pad drawn from that shirt . . . could be contaminated by evidence items and other paper bags that are sealed and other banker boxes that may be in the same room, the same vicinity, as that shirt?" Webb responded she had successfully trailed two escaped inmates using the inmates' clothing items, which had been stored together with other prisoners' property.

Webb did not know how long scent remains on an object and testified she was unaware of any scientific guidelines on the topic. Webb acknowledged the passage of time, in this case two months, might have affected the scent strength. She said, "That's why we could have gotten a negative. We don't know how much scent was on that shirt."

12

Webb was familiar with studies demonstrating each person has a unique smell. She stated persons who spend significant amounts of time together in a closed space can pick up the scent of individuals around them, but only "pretty recent and close" contact would transfer one person's to another person's clothing. She explained when an item has come into contact with several people she would expect a negative trailing result in that the dog would not trail anyone.

Webb could not think of a single instance when one of her bloodhounds had trailed the right scent to the wrong person. She assumes a dog who finds someone by trailing has followed the person's scent from "point A to point B." Webb had confidence in tracking and trailing, as opposed to scent identification, because the dog must stay with the scent until the person is found or the scent ends. On the other hand, she believed scent lineups are unreliable.

Gibbs's attorney posed the following hypothetical question: "If you have a case where a person is given a scent item, they smell it and they're taken to a place where people are and you're saying they trail to that person then that person is immediately arrested, you don't consider that to be a lineup?"

Webb said no. She pointed out the investigator asks the handler to show up somewhere. The investigator simply gives the handler a scent item and asks the handler to see if the dog will start to trail someone. Furthermore, the investigator is asked to ensure the individual is a good distance away from where the dog acquires the scent with "lots of turns" to make sure the dog is following a trail.

If the dog does not trail someone, Webb considers that a negative result and a way to eliminate suspects. Webb stated her bloodhounds are trained for scent tracking and trailing, not scent identification. According to Webb, her department uses bloodhounds to track and trail people, not identify suspects. In Webb's experience, they have been successful with scent items merely left lying on top of an item for a short time to collect a person's scent.

13

Oudin's attorney asked Webb if "dogs ever decided to switch the scent that they're tracking . . . ?" Webb acknowledged some dogs "switch scents." However, Webb stated dogs that exhibit this trait are washed out of the program and placed in a different type of canine unit. Webb had no problem with how the scent pads were collected, stored, and used in this case.

Garvin testified he was an experienced dog handler, and he has had Inga for over four years. He and Inga have had hundreds of hours of training over those years. They have spent over 100 hours training with scent pads. Inga lives and works with Garvin. They are an award winning team with a stack of training records three inches deep.

On August 8, Patterson asked Garvin to collect a scent pad from a particular item in the evidence locker. Garvin donned gloves and asked for the item by number. The property clerk handed him a sealed paper bag with "Munson" written on it. Garvin saw a shirt in the bag, placed two gauze pads inside the bag on top of the shirt and resealed the bag.

After about five minutes, Garvin removed the gauze pads one at a time and placed them in individual Ziplock bags. He put the Ziplock bags in individually labeled brown paper bags, put the paper bags in a Tupperware container and put the Tupperware container in a metal container in his patrol unit.

That night, Patterson summoned Garvin and Inga to Hesperia and asked Garvin to wait at the Hesperia Police Department. Patterson was to call Garvin again if Garvin and Inga were needed but Patterson did not call.

The following day, Patterson asked Garvin to bring Inga and the scent evidence to a public parking lot in Needles. When Garvin got to the parking lot, Patterson pointed out a grassy area and said, "Why don't you present the scent evidence in that area over there on the grass, on that side of the parking lot." Garvin presented the scent item to Inga, and told her to "find 'em."

14

Inga started in search mode, nose to the ground, something Garvin called casting. Initially, Inga went in Patterson's direction but then she went by him and continued casting around, before heading south along the east edge of the parking lot and to the bumper of one parked car. If Inga had not found a scent trail, she would have stayed in the area where he had presented the scent item.

Inga continued sniffing and searching, and moved from the back bumper to the driver's side of the car. She briefly put her nose to the door handle before returning it to the ground. Inga then led Garvin across the parking lot in between some parked cars and out onto a sidewalk. They proceeded on that sidewalk for a time and crossed a second sidewalk that led to a government building.

Inga immediately pulled her head up and circled back around, but then ran down the second sidewalk and into an open atrium in the building where she became excited. Inga ran to the other side of the atrium, jumped through a planter, and started to sniff on doors in a hallway.

When they got to one particular door, Inga sniffed the door handle, stayed put, wagged her tail, and reared up on her haunches wanting in, which Garvin and Webb testified is the signal she was trained to give when she has found the end of the trail.

Garvin opened the door for Inga and found a few people seated and standing in a small lobby. Inga sniffed everyone in the lobby and then sat down next to and put her paw on Gibbs. Garvin testified he told Patterson the trail ended when Inga found the door to the lobby.

Patterson testified he had three years in the canine division and was familiar with tracking and trailing. Patterson did not give Garvin any facts about the case or the trailing assignment, and Garvin did not know anything about Gibbs, his appearance or his car. Patterson ensured none of the crime scene personnel came into contact with the victim's clothing before it was taken to the pathologist.

15

After the testimony was completed, Gibbs's attorney argued Inga's trailing evidence was unreliable because the scent pad was made two months after the Munson's shirt was put in the evidence room. He pointed out there had been no effort to preserve the scent evidence, and it could contain any number of individual scents. He also asserted the trailing evidence unreliable. Finally, he claimed Patterson intended to identify Gibbs, so this was not a trailing case, but a scent identification case. Oudin's attorney joined in these objections.

At the conclusion of the preliminary fact determination hearing, the court found Webb qualified as an expert in dog scent trailing and tracking. The court further found Garvin and Inga highly qualified and reliable, and Inga had trailed a scent from the victim's shirt to Gibbs in a public area. Based upon these preliminary fact determinations the court overruled defendants' foundation objections and denied Gibbs's motion to exclude all dog scent evidence.

## DISCUSSION

*1. Dog Scent Trailing Evidence*

Defendants contend the court improperly admitted the dog scent trailing evidence because it lacked foundation. This contention presents two questions. First, what were the applicable foundation requirements? Second, was the evidence sufficient to satisfy those requirements? We will address both questions in turn, but first it will be necessary to set out the relevant dog scent evidence principles and standard of review.

*a. Dog Scent Evidence Principles and Standard of Review*

Four California cases bear directly on the dog scent trailing questions presented. They are *People v. Craig* (1978) 86 Cal.App.3d 905 (*Craig*); *People v. Malgren* (1983) 139 Cal.App.3d 234 (*Malgren*), (disapproved on other grounds in *People v. Jones* (1991) 53 Cal.3d 1115); *People v. Mitchell* (2003) 110 Cal.App.4th 772 (*Mitchell*); and *People v. Willis* (2004) 115 Cal.App.4th 379 (*Willis*). We will discuss them in the order decided, so we can trace the evolution of the relevant principles.

16

In *Craig*, three defendants were convicted of robbery in connection with a purse snatching, and two of those defendants were also convicted of the armed robbery of a car wash attendant which occurred shortly after the purse snatching. (*Craig*, *supra*, 86 Cal.App.3d at pp. 909-910.) Both crimes were committed by three African-American males driving a white Nova. (*Ibid.*) The Nova was followed from the car wash robbery to an apartment complex, where the suspects exited the car and ran. (*Id*. at p. 910.)

When the police arrived, they surrounded the complex. Three African-American males were sighted moving around together in various places, and managed to evade the police for a time, but were eventually detained. (*Craig*, *supra*, 86 Cal.App.3d at pp. 910-911.) The suspects were then placed in the lighted back seat of the squad car. (*Id*. at p. 911.) The car wash attendant was transported to the scene for an in-the-field identification, and he was able to identify two of the suspects, whereupon all of the suspects were taken to the police station. (*Ibid.*)

The Nova was searched and found to contain the stolen purse and some of its contents. (*Craig*, *supra*, 86 Cal.App.3d at p. 911.) An officer with an experienced, trained police dog was ordered to trail from the interior of the vehicle. After being allowed to smell inside the Nova, the dog followed the path of the suspects from the Nova to the point where they were detained. (*Id*. at pp. 910-911.)

On appeal the defendants contended the dog scent trailing evidence was improperly admitted due to a lack of foundation. (*Craig*, *supra*, 86 Cal.App.3d at p. 915.) The defendants relied on *Kelly*, which held evidence of voice-print analysis was improperly admitted due to a lack of foundation. (*Kelly*, *supra*, 17 Cal.3d at pp. 37-40.) The People argued *Kelly* was distinguishable because that case dealt with "'the demonstrable reliability of a newly developed scientific technique.'" (*Craig*, at p. 915.) The *Craig* court decided the problem was to be solved on a case-by-case basis rather than a blanket acceptance or rejection of all such evidence. (*Ibid.*)

17

The *Craig* court explained: "Were we to consider dog trailing to be on the same level as voiceprints, we could be compelled to judge its reliability by the standards set forth in *Kelly*. However, there is a basic distinction in the nature of the subject matter at hand. [¶] In the area of new scientific techniques, especially dealing with electronic gadgetry, one piece of testing apparatus is essentially the same as another of similar design, make and purpose. [¶] When dealing with animate objects, however, we must assume each and every unit is an individual and is different from all others. Within one breed of dog, or even with two dogs of the same parentage, it cannot be said each dog will have the same exact characteristics and abilities. Therefore, while the reliability of a machine can be duplicated and passed down the assembly line with relative ease, the abilities and reliability of each dog desired to be used in court must be shown on an individual basis before evidence of that dog's efforts is admissible. We simply cannot say all dogs can trail a human, or even that all dogs of specific breeds can do so." (*Craig*, *supra*, 86 Cal.App.3d at p. 915.)

The court continued: "We are not merely assuming a well-trained dog can trail a human; we say that this ability is a fact which, like other facts, may be proven by expert testimony. [¶] This testimony should come from a person sufficiently acquainted with the dog, his training, ability and past record of reliability. If the testimony comes from an expert in the area of training, trailing, and operational performance of such dogs, that expert is qualified to state an opinion as to the ability of that particular dog in question to trail a human. We feel *People v. Kelly*, *supra*, and *People v. King* (1968) 266 Cal.App.2d 437, 458, are distinguishable in that both cases deal with problems of *general acceptance* in the scientific community of inanimate scientific techniques, rather than specific recognition of one animal's ability to utilize a subjective, innate capability. [¶] The reliability of each dog must be shown when the dog's ability is to be used as evidence in court." (*Craig*, *supra*, 86 Cal.App.3d at pp. 915-916, fn. omitted.)

18

The *Craig* court noted there was extensive testimony as to the expert qualification of the dog's trainer, and the training and skills of the dog. (*Craig*, *supra*, 86 Cal.App.3d at p. 916.) The dog's trainer had been deemed an expert witness, and based on totality of his testimony, the dog was deemed able to follow a human trail. (*Ibid*.) Therefore, the trial court ruled a sufficient foundation had been laid. (*Ibid*.)

The appellate court found no error. First, the court held there was substantial evidence to support the trial court's conclusion the trainer was a qualified expert. (*Craig*, *supra*, 86 Cal.App.3d at p. 916.) Next, the court held that because the trainer qualified as an expert in this area, "his opinion, based on a hypothetical situation substantially similar to the facts in the case at hand, is admissible expert testimony." (*Ibid*.) Finally, based upon the expert's opinion about the dog's proven ability to follow a trail to the exclusion of all others, the court held: "We believe there is substantial evidence to support the trial court's finding of reliability. We, therefore, hold the trial court properly admitted the evidence." (*Id*. at p. 917, fn. omitted.)

Turning next to *Malgren*, that defendant was convicted of burglary. When the occupants of the burglarized home returned late one night they noticed the front door had been locked and the door handles had been removed. (*Malgren*, *supra*, 139 Cal.App.3d at p. 237.) They heard a loud crash in the bedroom, and heard someone running down the hall and loudly pulling at a dead-bolted door which opened into the backyard. (*Ibid*.) About 30 minutes later, a police officer with a tracking dog "walked several steps inside the front door and commanded the dog to 'track.'" (*Ibid*.)

The dog ran down the hallway, into the bedroom, through the opened and damaged back door, across the backyard, and into an adjacent game reserve. (*Malgren*, *supra*, 139 Cal.App.3d at p. 237.) The dog tracked for approximately 35 minutes over about seven-tenths of a mile, and then ran into some high bushes and began to growl and bite. (*Ibid*.) The defendant was found in the bushes. The bottoms of his pant legs were wet, and there were leaves on his jacket, and mud and grass stains on his shoes. (*Ibid*.)

19

On appeal, the *Malgren* court rejected the defendant's contention the dog trailing evidence was inadmissible for lack of a proper foundation under *Craig*. (*Malgren*, *supra*, 139 Cal.App.3d at p. 237.) The *Malgren* court held that the following must be shown before dog trailing evidence is admissible: "(1) the dog's handler was qualified by training and experience to use the dog; (2) the dog was adequately trained in tracking humans; (3) the dog has been found to be reliable in tracking humans; (4) the dog was placed on the track where circumstances indicated the guilty party to have been; and (5) the trail had not become stale or contaminated. [Citations.]" (*Id*. at p. 238)

In *Mitchell*, two defendants were convicted of first degree murder with personal use of firearms for shooting a gang rival. (*Mitchell*, *supra*, 110 Cal.App.4th at p. 775.) An eyewitness identified both defendants in photographic and live lineups. (*Id*. at pp. 776-778.) Reilly, a Labrador retriever trained in "scent discrimination" was then used to conduct a number of "scent identification" lineups. (*Id*. at pp. 778-779.)

Reilly's trainer and handler Joe D'Allura testified the scent discrimination performed by Reilly was to be distinguished from trailing scents or tracking, which was typically done by bloodhounds. (*Mitchell*, *supra*, 110 Cal.App.4th at p. 778.) D'Allura described the scent discrimination performed by Reilly as sniffing scent collected from an object a person was known to have touched and determining whether a second object had been touched by the same person. (*Ibid*.) Scents were collected by a small vacuum-cleaner-like device known as a scent transfer unit (STU), which was described as "'essentially a modified dust buster'" developed in 1994 by a bloodhound handler associated with the Niagra County Sheriff's Department in New York. (*Id*. at p. 779.)

The STU was used to collect scents from spent bullet shell casings found at the murder scene, as well as from the victim's shirt. (*Mitchell*, *supra*, 110 Cal.App.4th at p. 780.) Scents were also collected from shirts the defendants had worn, and from shirts worn by other members of the defendants' gang. (*Ibid*.) And three control pads were made with scents extracted from the chairs of three detectives not involved. (*Ibid*.)

20

"D'Allura and Reilly participated in nine lineups . . . .  In the first lineup, Reilly was given a pad to sniff that had scent extracted from the shell casings and matched it in the lineup to the pad that contained scent collected from [the defendant] Mitchell's shirt.  In another lineup, Reilly was given a pad to sniff that had scent collected from [the victim's] shirt and matched it in the lineup with Mitchell's pad.  Scent taken from Mitchell was not involved in any of the remaining seven lineups.  Reilly did not alert during these lineups, which included scent taken from [the defendant] Rogers, that any matches had been found."  (*Mitchell*, *supra*, 110 Cal.App.4th at pp. 780-781.)

Before trial, Mitchell moved to exclude evidence of the scent identification lineups on grounds that an adequate foundation could not be established for either scent identification lineup evidence in general or use of the STU in particular.  (*Mitchell*, *supra*, 110 Cal.App.4th at pp. 781-782.)  The trial court denied Mitchell's motion, finding the *Kelly* analysis did not apply to the challenged evidence and that a sufficient foundation had been established under existing case law.  (*Ibid*.)  The appellate court concluded this ruling was error.  (*Id*. at p. 782.)

The *Mitchell* court first addressed the argument that regardless of whether scent identification lineups are themselves subject to *Kelly*, the STU used in the preparation of the gauze pads employed in the scent lineup is a novel device within the meaning of *Kelly*.  (*Mitchell*, *supra*, 110 Cal.App.4th at p. 787.)  The court observed, "while analysis under *Kelly* may not be required for new devices used to conduct an established type of test or an established device used to conduct a new type of test, a scent lineup involves neither."  (*Id*. at p. 788.)  The court also noted:  "The technique of establishing a person's identity in a canine scent lineup has not been subject to judicial scrutiny in this state."  (*Id*. at p. 789.)  Therefore, the *Mitchell* court concluded the STU "is a novel device used in furtherance of a new technique" and it was error to deny Mitchell's request that the device be subjected to a *Kelly* hearing.  (*Ibid*.)

21

The *Mitchell* court next addressed the argument that scent identification lineups are themselves subject to *Kelly*. (*Mitchell*, *supra*, 110 Cal.App.4th at p. 790.) The court said the "differences between this type of evidence and evidence derived from scent identification lineups require a dramatic revision of the final element of the *Malgren* test, that 'the trail had not become stale or contaminated.'" (*Ibid*.)

The *Mitchell* court was "concerned about the absence of any evidence that every person has a scent so unique that it provides an accurate basis for a scent identification lineup." (*Mitchell*, *supra*, 110 Cal.App.4th at p. 791.) The court also had questions regarding certification procedures for scent identification lineup dogs, noting there are "established requirements for certification in area searches, cadaver searches, and trailing, but not for scent identification." (*Id*. at p. 792.) So the court concluded "that *Kelly* should have been applied to this evidence." (*Id*. at p. 793.)

The *Mitchell* court further concluded and explained: "even if *Kelly* were not deemed to apply to scent identification evidence in general, a greater foundation than the one provided here is needed for its admission. In tracking and trailing, there is a history of canine performance which provides the basis for the fifth *Malgren* element— that this type of evidence will be admitted if it is shown that the dog was put on a fresh trail. For scent identification to be relevant, there must be some basis for assumptions made about degradation and contamination of scent, both before and during collection, as well as the uniqueness of each person's odor, beyond the mere experiences of one trainer and one dog. Accordingly, scent lineup identification evidence was improperly admitted in this case." (*Mitchell*, *supra*, 110 Cal.App.4th at pp. 793-794.)

In *Willis* the defendant was convicted of first degree special-circumstance murder for killing his ex-girlfriend. (*Willis*, *supra*, 115 Cal.App.4th, 379.) The relationship between the defendant and the victim had been characterized by domestic violence. (*Id*. at p. 382.) Three weeks after she broke up with him, her body was found in a burning car in a church parking lot. (*Id*. at pp. 381-382.)

Investigators tried to link the defendant to the scene using a canine handler and a dog named Scarlet. (*Willis*, *supra*, 115 Cal.App.4th at p. 384.) The handler used the STU to create scent pads from certain objects found in the vicinity of the burned car: "a black purse, knit cap, black glove, black hair extension, and a minimart matchbook." (*Ibid.*) "Using the matchbook scent, Scarlet 'showed interest' (i.e., was animated or excited) in a vacant lot near the church and at several apartment houses where [the defendant] lived or spent time. After [the defendant] was arrested, Scarlet went right up to [him] in the police station and sat in his lap, in the presence of five deputies." (*Ibid.*)

The defendant made a pretrial motion to exclude all dog scent and STU evidence, asserting that it lacked foundation and was experimental. (*Willis*, *supra*, 115 Cal.App.4th at p. 385.) The prosecution made a counter-motion to have the dog scent evidence admitted, arguing the *Kelly* analysis did not apply to the collection or preservation of evidence. (*Ibid.*) The trial court ruled the evidence admissible. (*Ibid.*) The appellate court disagreed for three reasons.

First, the *Willis* court agreed with *Mitchell*, the STU is a novel device used in furtherance of a new technique and, as such, is subject to a *Kelly* analysis. (*Willis*, *supra*, 115 Cal.App.4th at p. 385.) "It is not obvious that a vacuum device can properly transfer scent to a gauze pad from an object. Nor is it evident that the scent would not degrade or become contaminated, or that scent would not remain in the STU after it was cleaned with alcohol. [Citation.]" (*Ibid.*)

Second, the *Willis* court, like the *Mitchell* court, concluded the evidence did not meet the foundation requirements of *Kelly*. (*Willis*, *supra*, 115 Cal.App.4th at p. 385.) As the *Willis* court explained: "The dog handler who testified for the prosecution is not a scientist or an engineer; therefore, he is not qualified to testify about the characteristics of the STU or the unit's acceptance in the scientific community. There was also no proof that the dog handler used correct scientific procedures while employing the STU." (*Id*. at pp. 385-386.)

23

Third, the *Willis* court, like the *Mitchell* court, found that apart from the *Kelly* rule deficiency, there was a foundational weakness in the dog identification evidence. (*Willis*, *supra*, 115 Cal.App.4th at p. 386.) Again agreeing with *Mitchell*, the court "observed, "'dog trailing is a lot different from dog scent recognition.'" [Citation.]" (*Ibid.*) Citing *Malgren* and *Craig*, the *Willis* court said, "Testimony showing that a dog pursued a fleeing suspect to the site where he was hiding is a clear-cut case of dog tracking, and—depending on the facts of each case—may be admissible." (*Ibid.*)

Thus, the *Willis* court agreed with *Mitchell*: "The prosecution cannot rely solely on anecdotes regarding the dog's capabilities. Instead, a foundation must be laid from academic or scientific sources regarding (a) how long scent remains on an object or at a location; (b) whether every person has a scent that is so unique that it provides an accurate basis for scent identification . . . ; (c) whether a particular breed of dog is characterized by acute powers of scent and discrimination; and (d) the adequacy of the certification procedures for scent identifications. [Citation.] None of these foundational requirements were met in this case." (*Willis*, *supra*, 115 Cal.App.4th at p. 386.)

Turning to the applicable standard of review, "'In determining the admissibility of evidence, the trial court has broad discretion.' (*People v. Williams* (1997) 16 Cal.4th 153, 196.)" (*People v. Lucas* (2014) 60 Cal.4th 153, 226.) In particular, "A trial court has broad discretion in determining whether a sufficient foundation has been laid to [admit evidence]. On appeal, we will reverse a trial court's ruling on such a foundational question only if the court clearly abused its discretion. [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1011; see also *Malgren*, *supra*, 139 Cal.App.3d at pp. 237-239.) Hence, "A trial court's exercise of discretion in admitting or excluding evidence . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

24

### b. Dog Scent Trailing Foundation Requirements

Defendants contend the court applied the wrong foundation requirements. They argue the task performed by Inga was akin to the scent identification in *Mitchell* and *Willis*, as distinguished from the scent trailing[1] in *Craig* and *Malgren*. Based upon this premise, they assert the court should have subjected the dog scent trailing evidence to *Kelly* analysis. Further, they assert that apart from the *Kelly* rule deficiency, the court should have applied the augmented foundation requirements articulated in *Mitchell* and *Willis*, not the foundation requirements set out in *Malgren*. We disagree.

The facts which bear on our determination of the foundation requirements applicable to the dog scent trailing evidence here are undisputed. Rather, the dispute concerns only the effect or legal significance of those facts. As a consequence, the foundation requirement questions are legal issues which we review de novo. (Cf. *People v. Cromer* (2001) 24 Cal.4th 889, 899; *People v. Aldridge* (1984) 35 Cal.3d 473, 477.)

At the outset it is important to note Inga, like the dogs in *Craig* and *Malgren*, is a bloodhound trained in scent trailing, not scent identification like the dogs in *Mitchell* and *Willis*. This is pertinent for two reasons. "First, [the] foundational requirements for qualification of tracking and trailing evidence often include the element that the dog be of a breed . . . characterized by acute powers of scent and discrimination. [Citations.]" (*Mitchell*, *supra*, 110 Cal.App.4th at p. 792.) Bloodhounds, as a breed, have long been recognized to possess such acute powers. (*Ibid*.) Second, dog scent trailing "'is a lot different than dog scent recognition.'" (*Id*. at p. 790; accord, *Willis*, *supra*, 115 Cal.App.4th at p. 386 [scent tracking "is a far cry" from scent identification].)

---

[1] We recognize courts and witnesses often use the terms "tracking" and "trailing" interchangeably. We also recognize there are technical differences between tracking and scent trailing, as described by Webb in her pretrial dog scent evidence hearing testimony summarized above. We use the terms "scent trailing" or "trailing," as distinguished from "tracking," because they most accurately describe the task performed by Inga.

25

This brings us to the crux of the matter at hand. At its core, the task performed by Inga can be fairly characterized as follows: Inga ostensibly followed a scent trail from the point where she smelled the scent pad exposed to Munson's shirt and thought to contain the scent of the guilty party, to the point some distance away where Gibbs was waiting in the sheriff's substation. It is no more complicated than that.

The task performed by Inga was essentially the same as the task the scent trailing dogs performed in *Craig* and *Malgren*. In *Craig*, the dog smelled the inside of the Nova, and ostensibly followed a scent trail from the Nova to the point some distance away where the defendants had been detained. And in *Malgren*, the dog smelled inside the front door of the burglarized home, and ostensibly followed a scent trail from the home to the point some distance away where the defendant was hiding in the bushes.

On the other hand, the task performed by Inga is essentially different than what the scent identification dogs did in *Mitchell* and *Willis*. In *Mitchell*, the dog smelled scent pads extracted from the shell casings and the victim's shirt, and ostensibly matched them in scent lineups to scent pads from the defendant's shirt. Likewise in *Willis*, the dog smelled a scent pad extracted from a matchbook found in the vicinity of the burned car, and ostensibly showed interest in various locales frequented by the defendant.

Therefore, we reject defendants' premise concerning the fundamental character of the task performed by Inga. It was scent trailing, not scent identification. And as the *Craig* court put it when rejecting similar claims, "there is a basic distinction in the nature of the subject matter at hand." (*Craig*, *supra*, 86 Cal.App.3d at p. 915.)

Further, as we will explain, all of the dissimilarities in technique or circumstance between this case and *Craig* and *Malgren* are adequately addressed by the foundation elements set out in *Malgren*, and none of those dissimilarities are "scientific" in the "definitive truth" sense, such as would require either *Kelly* analysis, or application of the augmented foundation requirements set out in *Mitchell* and *Willis*. (*Mitchell*, *supra*, 110 Cal.App.4th at pp. 782, 793-794; *Willis*, *supra*, 115 Cal.App.4th at p. 386.)

26

It is true this case, like *Mitchell* and *Willis* but unlike *Craig* and *Malgren*, involved the use of scent pads rather than the scent item itself. However, the scent pads here were prepared by exposing them through direct contact with the scent item, while the scent pads in *Mitchell* and *Willis* were prepared by exposing them through indirect contact with the scent item by means of the STU. These facts alone render irrelevant the conclusions in *Mitchell* that, the "scent transfer unit is a novel device used in furtherance of a new technique," and it "was error to deny [the] request that *the device* be subject to a hearing pursuant to *Kelly*." (*Mitchell*, *supra*, 110 Cal.App.4th at p. 789, italics added.)

In addition, the direct contact scent transfer technique used to prepare the gauze scent pads here has been recognized and endorsed as superior to use of the STU. As the *Mitchell* court noted, "the Law Enforcement Bloodhound Association and the National Police Bloodhound Association have not endorsed the scent transfer unit, saying '*it offers little advantage over using a gauze pad alone* and in fact might confound matters.' [Citation.]" (*Mitchell*, *supra*, 110 Cal.App.4th at p. 789, italics added.)

Plus, the direct contact scent transfer technique is not materially different than the process by which a suspect's scent is transferred through direct contact with the scent item in the first place. This process may involve a transfer of "microscopic skin cells, known as scruff." (*Mitchell*, *supra*, 110 Cal.App.4th at p. 780.) But no matter how it occurs, it surely involves no ""'"technique, process, or theory which is *new* to science and, even more so, the law."'"" So *Kelly* analysis was not required. (*Id*. at p. 782.)

It is also true in this case, like *Mitchell* and *Willis* but unlike *Craig* and *Malgren*, the scent pads were prepared and presented to the dogs a significant period of time after the crime was committed. That time period was roughly two months here, about a month in *Mitchell*, almost a day in *Willis*, a few minutes in *Craig* and a few hours in *Malgren*. Nevertheless, these temporal dissimilarities are squarely addressed by the fifth *Malgren* foundation element which requires evidence that "the trail had not become stale or contaminated." (*Malgren*, *supra*, 139 Cal.App.3d at p. 238.)

27

What's more, in this case the scent trail started with a scent pad which was presented to Inga almost two hundred miles from the scene of the crime, while in *Craig* and *Malgren* the scent trail started with scent items presented to the dogs at or near the crime scenes. All the same, these proximal dissimilarities are directly addressed by the fourth *Malgren* foundation element which requires evidence that "the dog was placed on the track where circumstances indicated the guilty party to have been." (*Malgren*, *supra*, 139 Cal.App.3d at p. 238.)

For these reasons, we conclude the court was not required to subject the dog scent trailing evidence to *Kelly* analysis, or to apply the augmented "scientific" foundation requirements articulated in *Mitchell* and *Willis*. Instead, the court correctly applied the *Malgren* test which required the prosecution to show: (1) Inga's handler was qualified by training and experience to use her; (2) Inga was adequately trained in trailing humans; (3) Inga had been found to be reliable in trailing humans; (4) Inga was placed on the trail where circumstances indicated the guilty party had been; and (5) the trail had not become stale or contaminated. (*Malgren*, *supra*, 139 Cal.App.3d at p. 238)

### c. Dog Scent Trailing Foundation Sufficiency

Defendants contend the evidence proffered in the preliminary admissibility determination hearing the court conducted under Evidence Code section 402, et seq. was insufficient to satisfy the *Malgren* foundation requirements. In such hearings, the power to judge the credibility of witnesses, weigh the evidence and draw factual inferences, is vested in the trial court. (Cf. *People v. Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 410.) "'On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence.' [Citations.]" (Cf. *People v. James* (1977) 19 Cal.3d 99, 107.) Thus, we review the record to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could make the disputed preliminary factual findings. (Cf. *People v. Bolin* (1998) 18 Cal.4th 297, 331.)

28

We first note defendants do not challenge the court's express finding that Webb qualified as an expert in dog tracking and trailing.[2]  We agree there is substantial evidence Webb was a qualified expert.  As in *Craig*, "The evidence as to [her] qualification was so extensive and conclusive we deem it unnecessary to repeat it in detail here."  (*Craig*, *supra*, 86 Cal.App.3d at p. 916.)  Further, because she helped train Garvin and Inga, and "[s]ince [she] is a qualified expert in this area, we hold [Webb's] opinion[s], based on a hypothetical situation substantially similar to the facts in the case at hand, [are] admissible expert testimony."  (*Ibid*; see also *Malgren, supra,* 139 Cal.App.3d at p. 238 [no error in admitting expert opinions of dog trainer].)

Next we observe defendants concede the prosecution proffered sufficient evidence to satisfy the first three *Malgren* elements.  We agree substantial evidence supports the court's express findings that:  (1) Inga's handler Garvin was qualified by training and experience to use Inga; (2) Inga was adequately trained in trailing humans; and (3) Inga had been found to be reliable in trailing humans.  Again the evidence on these points was also so extensive and conclusive we deem it unnecessary to repeat it.

Once more this brings us to the crux of the matter.  Defendants challenge the sufficiency of the evidence to support the court's implied findings that the prosecution proffered sufficient evidence at the pretrial preliminary admissibility determination hearing to satisfy the fourth and fifth elements of the *Malgren* test, namely that:  (4) Inga was placed on the trail where circumstances indicated the guilty party had been; and (5) the trail had not become stale or contaminated.  We rebuff this contention and instead conclude sufficient evidence supports both of these foundation requirements.

---

[2]  Defendants do contend, based upon *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769-772, and Evidence Code sections 801 and 802 governing the admissibility of expert opinions, that there is a need "for scientific evidence as a foundational requirement for the type of dog-scent evidence used in this case . . . ."  We reject this contention as it is part of their unmeritorious contention the court applied the wrong foundation requirements.

As noted, the trail in this case began at the point where Inga was presented with one of the scent pads thought to contain the scent of the guilty party. Garvin testified at length about his preparation of those scent pads. In a nutshell, while wearing gloves, he: retrieved Munson's shirt from the evidence locker; put two sterile gauze pads in the sealed bag with Munson's shirt for about five minutes; removed the gauze pads and put them in individual Ziploc bags; put the Ziploc bags in a Tupperware container; and put the Tupperware container in his patrol unit. Two days later he drove the scent pads to the Needles sheriff's substation parking lot, and presented one of them to Inga in the grassy area adjacent to the parking lot as directed by Patterson.

Patterson testified he had spent three years in the canine division and was himself experienced in trailing. Patterson had ensured none of the personnel at the crime scene contacted Munson's clothing, and he had not given Garvin any facts about the case.

Garvin presented the scent pad to Inga, and told her to "find 'em." Inga started casting about for a scent trail. Her scent range extended as much as a quarter mile. Inga soon headed south along the east edge of the parking lot to the bumper of the parked car where Gibbs had been standing just minutes before. If Inga had not found a scent trail, she would have stayed in the area where Garvin presented the scent pad.

Webb testified Inga was extensively trained using scent pads as a proxy for the scent item itself. Webb said no minimum amount of time was needed to saturate a scent pad, but had seen her bloodhounds successfully trail using a scent pad exposed to a scent item for just a couple of minutes, or left on top of a scent item for a short time.

Webb also said her bloodhounds had been successful with scent pads stored for long periods of time. She acknowledged the passage of two months from scent pad preparation to use in this case could have affected the scent strength, but said Inga was trained to smell the scent pad and investigate the area to determine if the scent was present. Webb and Garvin both testified if there was no track in the area that matched the scent, and if the scent was not present, Inga was trained to sit—not move.

30

Further, Inga had a proven record of track loyalty. For this reason Webb was unconcerned about the possibility that multiple persons besides the guilty party had touched Munson's shirt, or that Munson's shirt had been stored in a paper bag inside a banker's box in the same vicinity as other evidence items in other paper bags and other banker's boxes. While Webb admitted some bloodhounds had switched scents during training, they were washed out of the program, and she was unaware of any instance where one of the bloodhounds in the program tracked the right scent to the wrong person.

Finally, Webb conceded cuing occurs, but testified the procedures she used for training the bloodhounds and preparing them to trail minimized the risk cuing would occur by giving the handler as little information as possible about the reason for the trail. And both Patterson and Garvin confirmed that practice had been followed in this case.

In sum, our review of the record discloses evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could make the preliminary factual findings that Inga was placed on the trail where circumstances indicated the guilty party had been, and that the trail had not become stale or contaminated. It follows there is sufficient evidence in the record to support the court's implied findings that the fourth and fifth elements of the *Malgren* test were satisfied. What's more, most of defendants' doubts about how the scent pads were prepared, stored and used, would serve to obliterate not create a scent trail leading to Gibbs.

### d. Dog Scent Trailing Evidence Conclusions

We have concluded the court correctly applied the *Malgren* foundation requirements, and the prosecution proffered sufficient evidence at the pretrial hearing to support the court's preliminary fact determinations that those requirements had been satisfied. As a consequence, we also conclude defendants have failed to show the court exercised its discretion to admit the dog scent trailing evidence in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. Hence, we perceive no error in admitting that evidence over defendants' objections.

31

Finally, even if the court had erred in admitting the dog scent trailing evidence, on this record, as in *Mitchell* and *Willis*, that error would not warrant reversal under the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Mitchell, supra,* 110 Cal.App.4th at p. 795; *Willis, supra,* 115 Cal.App.4th at p. 388.) And, while defendants assert the "harmless beyond a reasonable doubt" standard prescribed in *Chapman v. California* (1967) 386 U.S. 18, 24, our Supreme Court has held application of ordinary rules of evidence does not implicate the federal Constitution. (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.)

*2. Dog Scent Trailing Instruction*

The court gave the jury the standard dog scent trailing instruction, CALCRIM No. 374, modified as follows: "You have received evidence about the use of a tracking or trailing dog. You may not conclude that . . . Gibbs is the person who committed the crime based only on the fact that a dog indicated him or the lobby area where he was sitting. Before you may rely on dog tracking evidence, there must be, [¶] 1. Evidence of the dog's general reliability as a tracker or to follow a trail; [¶] AND [¶] 2. Other corroborating evidence that the dog accurately followed the trail that led to a person who committed the crime. This other evidence does not need to independently link the defendant to the crime. [¶] In deciding the meaning and importance of the dog tracking or trailing evidence, consider the training, skill, and experience, if any, of the dog, its trainer, and its handler, together with anything else that you learned about the dog's work in this case, *including the manner and circumstances surrounding the identification by the dog, any evidence on the subject of whether the scent item was or was not contaminated, the manner and circumstances in which the evidence was presented to the dog and its handler, and the reaction, if any, of the dog (as described by the handler) to the dog scent identification evidence.*" (Italics added.) The italicized language was added at Gibbs's request. There were no other modifications requested, and there were no objections to giving the instruction as modified.

32

Defendants contend the court should have instructed the jury sua sponte to view the dog scent trailing evidence with caution. But even though a defendant need not object to preserve a challenge to an instruction that incorrectly states the law and affects his substantial rights, "'"""'"a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or *incomplete* unless the party has requested appropriate clarifying or amplifying language."'"""' [Citation.] Because defendants advocate a modification of the instruction rather than complete rejection, the issue has been forfeited." (*People v. Mackey* (2015) 233 Cal.App.4th 32, 106.)

Defendants' dog scent trailing instruction claim also fails on the merits. They note the dog scent trailing instruction given in *Craig*, included an admonition that, "Such dog trailing evidence must be viewed with the utmost caution." (*Craig*, *supra*, 86 Cal.App.3d at p. 917.) Defendants then argue it was reversible error not to include that type of admonition in this case. They explain, "[i]t is the burden of this argument that dog-scent evidence requires a stronger, more express admonition, to the effect that even after the foundational corroboration requirement has been met, such evidence should be viewed with care and caution." We are not persuaded.

This same dog scent trailing instruction argument was snubbed in *Malgren*, where the court held: "Nevertheless, we disagree that the court was obligated to instruct that dog trailing evidence must be viewed with caution, or that such evidence is of little probative value. Unlike accomplice testimony, dog tracking evidence is not inherently suspect because of a self-interested source. [Citation.] The notion that such evidence is of slight probative value or must be viewed with caution stems at least in part from a fear that a jury will be in awe of the animal's apparent powers and will give the evidence *too much* weight. [Citation.] In light of the stringent foundational requirements which must be met before such evidence is admissible at all, however, we see no reason to categorize that evidence thereafter as inferior or untrustworthy, and instruct that it be given *less* weight than other evidence." (*Malgren*, *supra*, 139 Cal.App.3d at p. 241.)

33

In addition, "The *Craig* court itself suggested that what the law in this state actually requires is not that dog trailing evidence be viewed with caution, but that it be treated as any other evidence, with its weight left to the trier of fact. (*Craig*, *supra*, 86 Cal.App.3d at p. 918.)" (*Malgren, supra,* 139 Cal.App.3d at pp. 241-242.)

Recognizing these hurdles, defendants urge us to disagree with the *Malgren* majority, and adopt the *Malgren* dissenting view which states in relevant part: "I cannot agree with the majority that the court was not required to instruct, *sua sponte*, that the dog-tracking evidence is of little probative value and must be viewed with caution. . . . I would hold further that whenever the evidence is admitted after a proper foundation has been laid, the jury must be instructed to view it with caution. [Citation.]" (*Malgren*, *supra*, 139 Cal.App.3d at p. 246, dis. opn. of Feinberg, J., italics in original.)

We agree with the *Malgren* majority view on this issue and we adopt it as our own. For that reason, we hold the court was not required to instruct the jury sua sponte to view the dog scent trailing evidence with caution.

*3. Eyewitness Identification Evidence*

Defendants contend Madelyn's out-of-court identification of Gibbs was improperly admitted into evidence. Recall Patterson asked Madelyn about Chernick's statement that she had seen an older man with a walker accompanied by a younger man in front of Munson's house on the afternoon of June 10, and Madelyn stated, "That would have been Wes [Gibbs]."

But Madelyn did not testify at trial. Instead, her out-of-court statement came in through the testimony of Riverside County Detective Martin Alfaro, one of the investigators in this case. The defense cross-examined Alfaro about why suspicion turned to Gibbs, and about the basis for issuing the search warrant for Gibbs's cell phone records. To counter that cross-examination, during redirect examination the prosecutor sought to introduce evidence that part of the probable cause for issuing the warrant was Chernick's observation of the two men, and Madelyn's statement about Gibbs.

34

Over defendants' Evidence Code section 352 objections, the prosecutor engaged Alfaro in the following colloquy: "[Prosecutor:] And you were aware of the statement of . . . Chernick where she says, 'I saw a younger, bigger male helping out an older male in a walker"; you were aware of that, correct? [¶] [Alfaro:] Yes. [¶] Q. And you were aware that, when that statement was presented to Madelyn . . . she identified the younger person as, 'That would have been Wes'? [¶] A. . . . Gibbs, yes. [¶] Q. And you were also aware that Madelyn . . . had described . . . Gibbs to law enforcement as the individual who drove defendant Oudin around when she couldn't because he would give her a break? [¶] A. Yes. [¶] Q. And all of those – all of those facts were included in your warrant to obtain . . . Gibbs's phone records? [¶] A. That is correct."

Immediately after that colloquy the court admonished the jury: "All right. Before we have cross, these witnesses aren't here. Chernick was, but the others aren't here to testify to that. So I'm not letting that in for you to consider as the truth of that statement, only as to the words were spoken, the effect it had on the officer. He used that information to further his investigation. So since we don't have those folks to cross-examine, we're not – I'm not letting it be submitted as a true statement, just the fact that the words were spoken and he considered it."

Defendants claim Madelyn's statement about Gibbs was inadmissible hearsay, the court abused its discretion under Evidence Code section 352, and the court violated their Sixth Amendment right to confront and cross-examine Madelyn. Not so.

One part of the defense strategy was to show law enforcement focused on defendants prematurely and ignored leads that might have implicated other people. The defense specifically questioned Alfaro about the basis for issuing the search warrant for Gibbs's cell phone records. As a result, Madelyn's out-of court statement about Gibbs became relevant for the limited nonhearsay purpose of showing what the factual basis was for issuing the search warrant.

35

The court carefully considered and overruled defendants' Evidence Code section 352 objection, and admitted Madelyn's statement for the limited nonhearsay purpose. That ruling was well within the court's broad discretion. (*People v. Ervine* (2009) 47 Cal.4th 745, 777 (*Ervine*).)

Further, the court gave a limiting instruction at the time her statement was first introduced. And at the conclusion of the trial, the jury was also instructed, "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." We presume the jury faithfully followed these limiting instructions. (*Ervine*, *supra*, 47 Cal.4th at p. 776.)

Defendants point out, correctly, limiting instructions have been deemed insufficient to protect a defendant from a nontestifying codefendant's confession implicating a defendant at a joint trial. (*Bruton v. United States* (1968) 391 U.S. 123; *People v. Jennings* (2010) 50 Cal.4th 616, 652.) "[B]ut *Bruton* recognized only a 'narrow exception' to the general rule that juries are presumed to follow limiting instructions [citation], and defendant[s] offer[] no rationale for extending the *Bruton* exception to this case." (*Ervine*, *supra*, 47 Cal.4th at p. 776.)

Ultimately, "Out-of-court statements that are not offered for their truth are not hearsay under California law (Evid. Code, § 1200, subd. (a); *Smith v. Whittier* (1892) 95 Cal. 279, 293-294), nor do they run afoul of the confrontation clause. (See *Crawford v. Washington* (2004) 541 U.S. 36, 60, fn. 9.)" (*Ervine*, *supra*, 47 Cal.4th at pp. 775-776.) The court did not err by admitting Madelyn's out-of court statement about Gibbs.

*4. Ineffective Assistance of Counsel*

Gibbs asserts his trial attorney rendered ineffective assistance, because she failed to object to the introduction of Madelyn's out-of-court statement about Gibbs. But his trial attorney did object on Evidence Code section 352 grounds, the court overruled that objection, and the court's ruling was correct. Consequently, there is no basis for Gibbs's ineffective assistance of counsel claim.

36

## 5. *New Trial Motion*

Gibbs claims the court erroneously denied his new trial motion. "On appeal, a trial court's ruling on a motion for new trial is subject to review for abuse of discretion. [Citations.]" (*People v. Clair* (1992) 2 Cal.4th 629, 667.) Applying that standard, we believe the court did not err. "Its ruling was reasonable. Indeed, any other would not have been." (*Ibid.*)

Defendants' lawyers both filed written new trial motions before sentencing. Oudin claimed new evidence warranted a new trial, and Inga's presence in the courtroom caused undue prejudice. Defendants both challenged the sufficiency of the evidence to prove identity absent the dog scent trailing evidence, and they claimed the court erroneously admitted this evidence because the prosecution failed to lay an adequate foundation. They also claimed the prosecutor committed misconduct. And Gibbs complained about the admission of the cell phone evidence.

About three weeks after Gibbs's lawyer filed his motion, Gibbs filed a request to proceed in propria persona and moved for funds to pay an investigator. Gibbs twice assured the court he would be able to go forward with the hearing on his new trial motion and sentencing, if necessary, on the date already set, January 4, 2013. The court told Gibbs that in addition to having the option to adopt prior counsel's motion for a new trial, he could also prepare a separate motion. The court also told Gibbs he bore the responsibility to present any evidence or witnesses at the time of sentencing, and appointed an investigator. The court denied Gibbs's request for a paralegal.

On November 29 and December 20, 2012, Gibbs filed motions to disqualify the trial judge. On December 31, Gibbs filed a motion for "additional investigator hours," and a request for continuance of the January 4, 2013 sentencing hearing date. According to Gibbs's motion, he "request[ed] a continuance due to the fact of this mover's diligence in preparation to amend motions filled [*sic*] my former attorney of record . . . ."

37

At the outset of the hearing on January 4, 2013, the court addressed Gibbs's motions to disqualify. The court explained Gibbs's first motion, a preemptory challenge under Code of Civil Procedure section 170.6, was denied as untimely. The court then struck the second motion, a claim of actual prejudice under Code of Civil Procedure section 170.1, subdivision (a)(6), for failure to state a basis for disqualification. The court next denied Gibbs's request for additional investigator hours, and turned to his continuance request.

The court asked Gibbs why he needed more time, and he responded: "[T]here are some things that, if Your Honor would have some patience with me and listen to those in camera, I will explain those things as far as I'm not asking for a lot of time, but you – the Court gave my attorney, which is a hired, regular, licensed attorney that has gone to college for this, I haven't, and I'm not asking to – to give me time because I don't know those things, but I'm asking for a little time so I can investigate those things, and a reasonable time, and before I even go to this motion for new trial, and . . . I am going to ask the Court to relieve me of my pro per status and – and appoint me an attorney that will argue those, because I am not ready to argue those or qualified to argue those."

Next the court heard and denied Oudin's new trial motion, and imposed sentence on Oudin.

The court then returned to Gibbs. "All right. Mr. Gibbs . . . I appointed yourself and your investigator a month and a half ago, so your request to continue this matter is denied. And so we have two things to deal with if you want to. It's a motion for new trial filed by your former attorney Mrs. Reed, and a written opposition was filed by the district attorney against that." The court also said, "I know you want to do another motion for new trial but I think enough time has passed that we need to go ahead with the sentencing."

38

Gibbs launched into a 63-page recitation of the issues raised in the written new trial motion, claimed his attorney was ineffective for a variety of reasons, including that she did not permit Gibbs to testify, and made repeated assertions of innocence. Gibbs claimed he had not seen the People's opposition to his new trial motion because the district attorney did not serve it on him.

The court responded, "Well, [the prosecutor] said out loud, basically, what he put in here . . . ." The court then described the contents of the motion and explained how the prosecutor addressed each issue, occasionally asking the prosecutor to elaborate or address a point.

At the conclusion of the hearing the court stated, "I think we thoroughly discussed this. The motion for a new trial as filed is denied. The issues raised about error are not significant, and I think there was sufficient evidence for the jury to arrive at the verdict that they did."

Gibbs now contends the court improperly confined the issues to those asserted in the written motion filed by his attorney, improperly ignored his ineffective assistance of counsel claim, and incorrectly discounted his asserted Fifth Amendment claim. Once more we are not persuaded.

Gibbs relies on *People v. Braxton* (2004) 34 Cal.4th 798 (*Braxton*) and asserts the court improperly refused to allow him to orally advance additional grounds for his new trial motion. In *Braxton,* a represented defendant stated at sentencing he "'would like to make a motion for new trial'" and that he had juror affidavits establishing jury misconduct. (*Id.* at p. 806.) The court refused to "'entertain any oral motion,'" ruling "that new trial motions must be submitted in writing before a sentencing hearing." (*Ibid.*) The Court of Appeal reversed, concluding new trial motions may be made either orally or in writing in criminal cases. (*Id.* at p. 807.) The California Supreme Court upheld this aspect of the decision, while also noting that it did not "condone defense counsel's conduct in making the motion at this time and in this fashion." (*Ibid.* fn. 2.)

39

*Braxton* is inapt. At the hearing the court here permitted Gibbs to elaborate on any issues raised in counsel's written new trial motion *and* allowed him to orally raise other issues. The record indicates the court addressed all of the issues Gibbs raised orally and in writing. And the court's ruling, in artful language aside, means the court found either there was no error, or that any error was harmless. Under these circumstances, the court did not abuse its discretion by denying Gibbs's new trial motion.

6. *Scent Dog in the Courtroom*

Oudin insists the court abused its discretion under Evidence Code section 352 by permitting Inga to be present in the courtroom during Garvin's testimony. He contends Inga's presence was more prejudicial than probative and violated his due process right to a fair trial. We agree.

As Gibbs's attorney observed, "People love dogs, and it has no probative value to have the dog here at all." The only reason cited for having Inga in the courtroom while Garvin testified was they were due to leave on a trip together.

We conclude there was no probative value to allowing Inga in the courtroom during Garvin's testimony. On the other hand, Inga's presence likely generated sympathy for Garvin and bias against defendants. Even so, after an examination of the entire record, we are of the opinion it is not "reasonably probable that a result more favorable" to Oudin would have been reached in the absence of the error in permitting Inga to be present in the courtroom. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) The evidence of defendants' guilt was overwhelming and the error was harmless

7. *Cumulative Error*

Oudin summarily avers the cumulative effect of the asserted errors denied him a fair trial. We have individually considered each claim of error and found only one, which was harmless. Defendants were "entitled to a fair trial, not a perfect one. [Citation.]" (*People v. Box* (2000) 23 Cal.4th 1153, 1214, overruled on other grounds in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.) Defendants received a fair trial.

40

## DISPOSITION

The judgment is affirmed.

THOMPSON, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

MOORE, J.