[Crim. No. 9364. Third Dist. Dec. 1, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DAVID CRAIG et al., Defendants and Appellants.

■■■■■■■
■■■■■■■

## COUNSEL

Paul Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Gary S. Goodpaster and Ezra Hendon, Chief Assistant State Public Defenders, Richard L. Phillips, James G. Wright, Michael Lee Pinkerton, and Laurance Smith, Deputy State Public Defenders, Hayne R. Moyer and Rebecca W. Phillips, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and Robert F. Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**REGAN, Acting P. J.**—These are appeals from judgments entered upon jury convictions for violations of Penal Code sections 211 (robbery), 496 (possession of stolen property), and 1203.6, subdivision (a)(1), and 12022.5 (use of a firearm during the commission of one of the robberies).

On January 30, 1977, about 8:30 p.m., Melinda Duncan was walking through the parking lot of a food market at Stockton and Fruitridge in Sacramento, California, when she was approached from behind by a black male. She was carrying a purse over her left arm. The man seized the purse and then struck Ms. Duncan in the face. She refused to relinquish the purse and the man dragged her by the purse across the parking lot until the purse strap broke; he then ran with the purse to a car.

Ms. Duncan followed the suspect to the car which contained two other black men whom she was unable to identify. She and the suspect reached the car about the same time and they ended up facing each other over the open door on the passenger side. The suspect then struck Ms. Duncan repeatedly in the face with his fist. When she fell to the ground, he entered the car and they drove away. Ms. Duncan identified defendant Cunningham as the man who struck her and took her purse. She described the car as an older, white Nova, with red interior. When shown a picture of the car, she identified it as the one the suspect used. The car was later proved to be a stolen vehicle.

■■■■■■

About 10:45 that same night, a white Nova, containing three black males, was driven to the gas-pump location of a car wash at Florin and Franklin in Sacramento. The driver requested gasoline. While the pump was running, Michael Fox, the attendant and a subsequent victim, was in the attendant's booth and had occasion to observe, for a few seconds, the face of the man on the passenger side of the front seat. He subsequently identified him as defendant Turner.

After stopping the pump, Fox requested payment from the driver. The driver, pointing a revolver at Fox, said something to the effect of "give me the money." Fox opened the cash drawer, telling him to "go ahead, take it." As the driver raided the cash drawer, Fox backed away and ran to call the police. Upon returning to the booth, after the suspects had fled, he noticed the liner of the cash drawer and an estimated $100 were missing. Fox subsequently identified defendant Craig as the driver.

Observing Fox running toward the office, a coworker, Mitch Willey, asked what happened. Fox said: "I've been robbed." Willey, and two others, Richard Mason and Ken Pritten, then pursued the white Nova in two vehicles. At an apartment complex on 29th Street, the Nova entered the south driveway bordering the complex and stopped. The three suspects exited, running into the complex. Mason, who had followed the Nova to the complex, went to a nearby apartment and asked the occupants to call the police. Mason did not see any person moving around the grounds of the complex.

When the police arrived, they began to surround the complex. One of the first units to arrive was Officer Reed with an experienced, trained police dog. Reed was driving slowly when the dog alerted and barked and Reed stopped the car. He then sighted three black males together at an exit to 29th Street near the center of the complex. The three persons turned and reentered the complex. Reed radioed a report of the sighting to other officers who, by now, had a brief description of the suspects.

Officers Hagio and Strassberg were in a marked squad car driving along the northern perimeter of the complex. Shortly after they heard Reed's broadcast, they observed three black males moving inside the complex. Hagio stopped the vehicle and he and Strassberg exited and attempted to follow the three subjects. However, the subjects disappeared. The officers were returning to their squad car when the three subjects reappeared and were ordered to approach the squad car, which they did.

The officers conducted a pat-down search for weapons and the subjects were advised of the officers' participation in a robbery investigation. The subjects were questioned, then placed into the lighted back seat of the squad car. The robbery victim, Fox, was transported to the scene in an attempt to make an in-the-field identification. Fox was driven past the lighted squad car and was able to identify Craig and Turner, whereupon all the subjects were taken to the police station.

The Nova was searched and found to contain Ms. Duncan's purse and some of its contents. Officers then searched the complex for the cash-drawer liner, gun and other evidence, but found nothing. Officer Reed and the dog were ordered to track from the interior of the vehicle. After being allowed to smell inside the Nova, the dog followed the path of the suspects from that point to the point where the detention occurred.

Defendants contend the stop, pat-down search, detention and arrest were all unlawful; and their suppression motions pursuant to Penal Code section 1538.5 should have been granted.

■ It is well established that a temporary detention may be justified by circumstances falling short of probable cause to arrest. An officer may stop and question persons on public streets when the circumstances indicate to a reasonable man in a like position that such a course of action is called for in the proper discharge of the officer's duties. The good-faith suspicion which warrants an officer's detention of a person for investigative reasons is necessarily of a lesser standard than required to effect an arrest. Where there is rational belief of criminal activity connected to the suspect, a detention for reasonable investigative procedures infringes no constitutional restraint. (*People* v. *Harris* (1975) 15 Cal.3d 384, 388-389 [124 Cal.Rptr. 536, 540 P.2d 632]; *People* v. *Flores* (1974) 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353]; cf. *In re Tony C.* (1978) 21 Cal.3d 888, 892 [148 Cal.Rptr. 366, 582 P.2d 957].)

The officers here were acting on a general description of the robbery suspects. However, a general description has been held sufficient justification for stopping and questioning persons meeting that description. (See *People* v. *Curtis* (1969) 70 Cal.2d 347, 358 [74 Cal.Rptr. 713, 450 P.2d 33]; *People* v. *Blackmon* (1969) 276 Cal.App.2d 346, 348 [80 Cal.Rptr. 862].)

■ Defendants did not perfectly match the general description given, however, since the descriptions and appearances were substantially the same, and coincided in the discernable factors (race, sex, build, number),

we hold the officers acted reasonably, under the circumstances, in stopping and initially detaining the defendants.[1]

■ That officers have the right to conduct a pat-down search, under the proper circumstances, cannot be denied. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 27 [20 L.Ed.2d 889, 909, 88 S.Ct. 1868]; *People* v. *Lawler* (1973) 9 Cal.3d 156, 161 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *Superior Court* (1972) 7 Cal.3d 186, 204 [101 Cal.Rptr. 837, 496 P.2d 1205].) The officers were aware the crime involved was armed robbery, and a revolver had been used. We hold such knowledge sufficient, under the circumstances, to warrant the pat-down search.

■ Defendants next argue that their placement in the back seat of the patrol vehicle was in effect an arrest, and unlawful as being without probable cause. The People argue this was reasonable detention, warranted by the circumstances, for the purpose of in-field witness identification. We agree.

In *People* v. *Harris, supra,* 15 Cal.3d at page 389, the courts first noted the existence of a gray area, where the facts justify measures beyond detention but short of arrest. The facts in *Harris* were similar to those here, where suspects had been properly stopped a few blocks from the crime scene, had aroused further suspicion in the officers (but short of probable cause), and where the officers desired a witness-identification of the suspects to bolster the case. The *Harris* court was disinclined to hold that circumstances short of probable cause are never sufficient to warrant transportation of a *suspect* back to the *crime scene* for identification. (*Id.,* at p. 390.) The court indicated instances in which such transportation might be reasonable, then said: "Ordinarily there exist less intrusive and more reasonable alternatives to pre-arrest transportation. The officers may call or escort the *witness* to the *detention scene* for an immediate viewing of the suspect . . . ." (Italics added.) (*Id.,* at p. 391.) The *Harris* court, noting the failure of the officers to use an alternative to transportation of the suspect, and the total lack of exigent circumstances which would justify the transportation of the suspect, held the officers' taking the suspect back to the scene of the crime for identification violated the suspect's constitutional rights. (*Id.,* at p. 391.)

---

[1]The suspects had been described by the victim, Fox. The first was a male Negro, small Afro, five feet, nine inches tall, medium build, blue levis. The second, a male Negro, medium Afro, yellow beanie-type hat with "Cheerios" on the back, and a torn shirt. The third, a male Negro with a small Afro. When stopped, at least one suspect had pink curlers in his hair. There was no "Cheerios" beanie, and no torn shirt.

The facts and circumstances here fit squarely within the suggested alternative of *Harris*. Implicit in that decision is the belief of the Supreme Court in the right of officers to detain a suspect for a reasonable period of time for identification. Accordingly, we hold the officers' detention of defendants, for the purpose of identification by the victim was reasonable where the period of detention was only a few minutes (5-10), and the *victim* was brought to the suspect. It was proper, under the circumstances, for defendants to be held inside a police vehicle while awaiting the victim. If *Harris* would allow transportation of a suspect in a police vehicle, the similar placement of a suspect in a police vehicle would not, in our view, be improper where the vehicle is immobile.

■ Once Fox had identified defendants Craig and Turner, there was ample probable cause to arrest all defendants. Cunningham's contention that he should have been released because he was not identified is totally without merit. There had been a crime involving three male Negroes, who had committed an armed robbery, were pursued by witnesses to an apartment complex, where, a few minutes later, three male Negroes were apprehended by officers. A positive identification was made of two of the three, only about thirty minutes having elapsed between the robbery and the identification. In fact, the men were not out of the sight of witnesses or officers for more than about five or ten minutes. We are asked to believe one suspect split off from the others and was replaced by Cunningham without either person being seen alone in the complex. There was ample probable cause to arrest Cunningham as the third, unidentified subject.

Having held all defendants' arrests valid, it naturally follows the subsequent identification of Cunningham by Ms. Duncan was therefore not the fruit of an illegal arrest.

■ Defendants next contend the field identification by the victim, Fox, was unconstitutionally suggestive and should have been excluded. The propriety of such an identification has been upheld repeatedly. (See *People v. Rodriguez* (1970) 10 Cal.App.3d 18, 29-30 [88 Cal.Rptr. 789]; *People v. Anthony* (1970) 7 Cal.App.3d 751, 764-765 [86 Cal.Rptr. 767]; *People v. Levine* (1969) 276 Cal.App.2d 206, 208 [80 Cal.Rptr. 731]; *People v. Colgain* (1969) 276 Cal.App.2d 118, 125-127 [80 Cal.Rptr. 659].) Where the defendant claims the pretrial identification was unnecessarily suggestive, he must show it gave rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967].)

Defendants argue the in-field identification was too suggestive in that it exhibited only the defendants, they were inside a police car, police officers were around the car, and the victim had seen the escape vehicle abandoned in the parking lot. Defendants cite *People* v. *Sandoval* (1977) 70 Cal.App.3d 73, 85 [138 Cal.Rptr. 609], for the proposition a "single person showup" should not be used without a compelling reason. *Sandoval* did not involve an in-the-field identification, and the rationale of cases upholding these in-field identifications (e.g., *People* v. *Anthony, supra,* 7 Cal.App.3d at pp. 764-765) justifies single person showups, so long as the procedures used do not give rise to impermissible suggestion, a determination to be made in light of all the circumstances of the case. (*People* v. *Sandoval, supra,* at p. 85.)

We hold the procedures used by the police were justified by the nature of the circumstances. The identification was not unnecessarily suggestive.

Defendants contend there was error in allowing their in-court identification, due to an unnecessarily suggestive showup with Fox at the police station on the night of the crime. Fox was shown recent photographs of the three suspects and asked to identify which of the three he recognized.[2] He pointed out the two suspects he had identified earlier.

■ A tainted pretrial identification makes an in-court identification inadmissible unless it can be shown the in-court identification had an origin independent of the pretrial identification. (*People* v. *Williams* (1973) 9 Cal.3d 24, 37 [106 Cal.Rptr. 622, 506 P.2d 998].)

After much questioning the trial court was satisfied Fox could make an independent in-court identification of the defendants without resorting to anything but the circumstances of the robbery itself. Though Fox admitted he could not completely wipe the other identifications from his mind, he stated he could also identify defendants solely from his perception of the crime itself. We find the trial court's determination of independent identification supported by substantial evidence and, therefore, hold the in-court identification proper and the effects of any possible taint from the showup harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Sandoval, supra,* 70 Cal.App.3d at p. 86.)

---

[2] At the in-field identification, Fox indicated "that's them," but a short time later indicated he could only identify two of the three suspects (defendants Craig and Turner). The officer preparing to interrogate the suspects desired to know first which of the three was unidentified and where were the two identified suspects sitting in the car at the time of the robbery.

■ Defendants next contend the evidence of dog trailing was improperly admitted at trial. Defendants rely on *People* v. *Kelly* (1976) 17 Cal.3d 24, 37-40 [130 Cal.Rptr. 144, 549 P.2d 1240], which held that evidence of voiceprint analysis was improperly admitted due to a lack of proper foundation. This is apparently a case of first impression in California. The nationwide authority on the subject of dog tracking is conflicting and of doubtful value, since we view the problem as one to be solved on an individual basis rather than a blanket acceptance or rejection of all such evidence.

The People argue *Kelly* is distinguishable because that case dealt with "the demonstrable reliability of a newly developed scientific technique." The argument is not without merit.

Were we to consider dog trailing to be on the same level as voiceprints, we could be compelled to judge its reliability by the standards set forth in *Kelly*. However, there is a basic distinction in the nature of the subject matter at hand.

In the area of new scientific techniques, especially dealing with electronic gadgetry, one piece of testing apparatus is essentially the same as another of similar design, make and purpose.

When dealing with animate objects, however, we must assume each and every unit is an individual and is different from all others. Within one breed of dog, or even with two dogs of the same parentage, it cannot be said each dog will have the same exact characteristics and abilities. Therefore, while the reliability of a machine can be duplicated and passed down the assembly line with relative ease, the abilities and reliability of each dog desired to be used in court must be shown on an individual basis before evidence of that dog's efforts is admissible. We simply cannot say all dogs can trail a human, or even that all dogs of specific breeds can do so.

Therefore, rather than attempt to identify certain specific criteria as being indicative of the ability of dogs, in general, to trail a human, we choose to require each particular dog's ability and reliability be shown on a case-by-case basis. We are not merely assuming a well-trained dog can trail a human; we say that this ability is a fact which, like other facts, may be proven by expert testimony.

This testimony should come from a person sufficiently acquainted with the dog, his training, ability and past record of reliability. If the testimony comes from an expert in the area of training, trailing, and operational performance of such dogs, that expert is qualified to state an opinion as to

the ability of that particular dog in question to trail a human.[3] We feel *People* v. *Kelly, supra,* and *People* v. *King* (1968) 266 Cal.App.2d 437, 458 [72 Cal.Rptr. 478], are distinguishable in that both cases deal with problems of *general acceptance* in the scientific community of inanimate scientific techniques, rather than specific recognition of one animal's ability to utilize a subjective, innate capability.

The reliability of each dog must be shown when the dog's ability is to be used as evidence in court. This subjective, innate ability depends upon many variables within the animal itself, which may become changed, damaged, or lost, whereby a once proven ability suffers impairment.

There was extensive testimony taken as to the expert qualification of Robert Outman, a dog trainer, and the training and skills of the dog. Outman was deemed an expert witness by the court, based on his evidenced qualification in the area. Based on the totality of the testimony, the dog was deemed able to follow a human trail. The evidence of his following defendants in this case was deemed competent. The court held a sufficient foundation had been laid and the evidence would be admitted.

Initially, we hold there was substantial evidence upon which the trial court could conclude Outman was a qualified expert. The evidence as to his qualification was so extensive and conclusive we deem it unnecessary to repeat it in detail here. We are careful to limit this qualification to Outman's proven expertise in dog training and handling, with particular emphasis on the training and handling of police dogs. Outman had trained the dog involved in this case.

Since Outman is a qualified expert in this area, we hold his opinion, based on a hypothetical situation substantially similar to the facts in the case at hand, is admissible expert testimony. Outman stated that Bobby (the dog) was able to follow a trail from beginning to end, to the exclusion of all other trails that may have intervened. He also stated Bobby and Officer Reed had been trained by him to work together, and performed in an excellent manner as a team. Bobby was performing at the 100 percent level in explosives detection, and work with humans.

---

[3]We note the possible pecuniary interest of such experts in having their own dogs proven reliable in court. We feel this interest is not sufficient of itself to make the testimony unreliable as a matter of law, but is merely a factor going to the weight of such evidence, to be evaluated by the finder of fact.

Bobby and Reed rated 100 percent when started from a vehicle, and they maintained that proficiency level through subsequent evaluations conducted by Outman. Their overall performance had improved since the end of Outman's training.

After Outman's training, Bobby was further tested on a regular basis, about twice weekly by Reed. Besides the regular training, Reed utilized Bobby on at least four similar occasions prior to the events here in question.

In addition to these full-blown searches, Bobby had, on numerous occasions, followed suspects to a point where the evidence showed the suspects had entered vehicles and driven away. We believe there is substantial evidence to support the trial court's finding of reliability. ■ ■ We, therefore, hold the trial court properly admitted the evidence.[4]

■ Defendants' next contention of error deals with the trial court's jury instruction regarding the evidence of dog trailing.

The proposed instruction read: "Testimony of dog trailing has been presented in this case. Such dog trailing evidence must be viewed with the utmost of caution and is of slight probative value. Such evidence must be considered, if found reliable, not separately, but in conjunction with all other testimony in the case, and in the absence of some other direct evidence of guilt, dog trailing evidence would not warrant conviction."

The instruction was modified and given as follows: "Testimony of dog trailing has been presented in this case. Such dog trailing evidence must be viewed with the utmost of caution. Such evidence must be considered, if found reliable, not separately, but in conjunction with all other evidence in the case. Dog trailing evidence alone is not sufficient to warrant conviction. In determining what weight to give such evidence you should consider the training, proficiency, experience, and proven ability, if any, of the dog, its trainer, and its handler, together with all the circumstances surrounding the trailing in question."

---

[4]Defendants contend the evidence is inadmissible hearsay. Since a hearsay declarant is defined as "a person" (Evid. Code, § 135), and since the reliability of the evidence has already been extensively proven, and the defendants were given the opportunity to cross-examine the expert witness and officer who handled the dog, we feel the contention is without merit.

Defendants contend the modifications allow the evidence too much weight. We hold it is not necessary to say there must be some *other* evidence of guilt, if you say dog trailing, *by itself,* is not sufficient to warrant conviction. The latter statement carries with it, by necessary implication, the fact that the evidence could only be sufficient to warrant conviction if supported by other evidence.

The only difference of substance between the proposed and modified instruction is in the deletion of the "slight probative value" wording. This deletion changes the effect of the instruction by allowing the evidence to be given more than just slight probative value. However, the modified instruction more closely states the law on this point. It treats evidence of dog trailing the same as any other evidence by allowing the weight given to the evidence to be left to the discretion of the finder of fact. (Evid. Code, § 312.) We hold there was no error in giving the modified instruction.

■■■ Defendants' next contentions deal with the denial of mistrial motions, which were based on jury and spectator misconduct, and with the cumulative effect of such conduct. The misconduct alleged is twofold. Initially, a juror asked Officer Reed in the hallway outside the courtroom if the jury would be able to see the dog. Reed answered no, and the juror asked where the dog was. Reed replied that the dog was in the hospital.

Defendants argue this unauthorized communication was prejudicial to their defense, in that it alerted the prosecution to the jury's desire to know why the dog was not brought into court for their observation. Since the prosecution subsequently told the jury the dog had been injured, there is also a question, raised by defendants, as to whether the prosecution should be allowed to profit by the asserted misconduct, which they allege to be a deprivation of due process and impartial jury guarantees.

The trial court, in its discretion, denied the motion for mistrial, and our duty is to determine whether such action was an abuse of discretion. (*People* v. *Roy* (1971) 18 Cal.App.3d 537, 554 [95 Cal.Rptr. 884].) We hold any possibility of misconduct by unauthorized receipt of evidence was cured by the subsequent exposure of the entire jury to the evidence of the dog's whereabouts. Since defendants do not appeal the trial court's decision allowing the prosecution to show the dog's present whereabouts, we do not decide whether that evidence was properly admitted.

Defendants, additionally, argue there was reversible error in the trial court's denial of the motion for mistrial based on further juror misconduct, in that six of the jurors read a newspaper article on the accuracy of dogs used by the Sacramento Police Department. The article made no mention of the trial.

The court questioned the jury as a whole to determine if any of the jurors had seen the newspaper article. Six jurors had seen it. The jury was admonished to disregard it, or not to read it if it had not already been read. The judge also asked if those jurors who read it would have any problem disregarding its contents in their determination of the case. They were asked if they would have any difficulty in setting aside the article from their minds. None answered negatively. Defense counsel at that point appeared satisfied with the judge's handling of the matter and did not move for mistrial until sometime later.

Setting aside the question of waiver by failure to object timely, we are of the opinion any prejudice to defendants was cured by the court's admonition and assurance from the jurors that they would have no difficulty disregarding the article in the determination of the facts.

"It is misconduct for a juror to read newspaper accounts of a case on which he is sitting." (*People* v. *Lambright* (1964) 61 Cal.2d 482, 486 [39 Cal.Rptr. 209, 393 P.2d 409].) When misconduct is shown, it is presumed injurious to defendant unless shown otherwise. (*People* v. *Wong Loung* (1911) 159 Cal. 520, 529 [114 P. 829].) But here the article did not relate to the case upon which the jurors were sitting. Moreover, the court's immediate admonition, along with the jury's negative response sufficiently shows nonprejudice. Any misconduct being sufficiently cured, there was no error in denying a motion for mistrial. The trial court was satisfied no injustice would result, and we are as well. (*People* v. *Romero* (1977) 68 Cal.App.3d 543, 548 [137 Cal.Rptr. 675]; *People* v. *Slocum* (1975) 52 Cal.App.3d 867, 884 [125 Cal.Rptr. 442].)

As to the question of spectator misconduct, the first of two motions for mistrial came as a result of picketing inside the courthouse, which the jury had observed. The other motion for mistrial, based on spectator misconduct, came when a spectator was seen by jurors to be making motions with his hands during some defense-witness testimony. Defendants argue a necessary implication of the motions is the testimony of the defense witness was being coached, or was fabricated.

■ Misconduct on the part of a spectator constitutes a ground for mistrial if the misconduct is of such a character as to prejudice the defendant or influence the verdict. (*Ibid.*) However, a motion for mistrial may properly be refused where the court is satisfied no injustice has or will result from the conduct. (*People* v. *Romero, supra,* at p. 548; *People* v. *Slocum, supra,* at p. 884.)

The trial court indicated its satisfaction with the ability of the jury to render a fair and impartial verdict. The jury was promptly admonished to disregard outside influences. The trial court took proper, immediate action in each instance to insure against prejudice. (*People* v. *Slocum, supra,* at p. 883.) We hold the denial of motions for mistrial based on incidents of spectator misconduct was proper. We likewise hold the cumulative effect of claimed juror and spectator misconduct insufficient to constitute a denial of a fair trial. There simply was no showing of prejudice, other than by speculation of defense counsel, which speculation was easily overcome by the actions of the trial court. Even were we to concede error in any or all of these alleged misconduct instances, we would hold such error harmless since we are satisfied beyond a reasonable doubt they did not contribute to the verdict. (*Chapman* v. *California* (1967) *supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

■ At the beginning of trial, Cunningham moved for severance of his trial from that of his codefendants and contends the denial of this motion was reversible error.

A motion for severance is directed to the sound discretion of the trial court whose ruling will not be reversed on appeal in the absence of an abuse of discretion. (*People* v. *Floyd* (1970) 1 Cal.3d 694, 720 [83 Cal.Rptr. 608, 464 P.2d 64].)

Defendant argues there was such an abuse, since he was not charged with the armed robbery of the gas station (count II), yet the court failed to limit the use of the evidence on that count to the other defendants. This argument misses the mark. The evidence relating to count II also applies in greatest measure to the charge in count III, possession of a stolen vehicle. Logical inferences may be drawn from the count II evidence to the effect defendant was the third person in the suspect vehicle during the robbery, whereby defendant is definitely linked to the stolen vehicle which was the subject matter of the count III charge. We hold there was no abuse of discretion and no error in the denial of the severance motion.

Finally, defendants contend the cumulative effect of error and misconduct requires reversal. Although in a proper case this is a ground for reversal (see *People* v. *Buffum* (1953) 40 Cal.2d 709, 726 [256 P.2d 317]; *People* v. *Hatchett* (1944) 63 Cal.App.2d 144, 152 [146 P.2d 469]), this is not such a case. We have not found error; and as we have stated on occasion, any possible error would be harmless beyond a reasonable doubt. There was no error in denying motions for mistrial based on both juror and spectator misconduct. Our review of the record discloses nothing of substance upon which to base a cumulative error contention. We hold such contention to be without merit.

The judgments are affirmed.

Paras, J., and Evans, J., concurred.

On December 26, 1978, the opinion was modified to read as printed above. Appellants' petitions for a hearing by the Supreme Court were denied February 1, 1979.