Filed 6/1/21  P. v. Roller CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074909 |
| v. | (Super.Ct.No. BAF1800544) |
| CHRISTOPHER LANCE ROLLER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Alfonso Fernandez, Judge.  (Retired judge of the Santa Clara County Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Eric A. Swenson and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Christopher Lance Roller and a friend entered a house while the occupant was out of town. When a neighbor challenged them, they said they were there to clean the house, at the occupant's request. The occupant later found $3,000 and other items missing. Defendant took the stand and testified that he entered the house only because his friend seemed to be doing work there and asked him for a bid to clean it up.

In a jury trial, defendant was found guilty of one count of first degree burglary. (§§ 459, 460, subd. (a).)[1] He was sentenced to four years (the midterm) in prison.

Defendant now contends:

1. There was insufficient evidence of criminal intent to support defendant's conviction for burglary.

2. Defendant's statements to the police were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and its progeny.

3. Because the trial court found that defendant was not able to pay certain fees, it erred by imposing other fees and fines.

Finding no prejudicial error, we will affirm.

---

[1] These and all further statutory citations are to the Penal Code, unless otherwise indicated.

I

STATEMENT OF FACTS

A.      *Prosecution Case*.

Victim Joe Lucero lived alone at a house on High Street in Cherry Valley.  On April 1, 2018, he went to visit his mother in Colton.  Before leaving, he locked his back door with a padlock.  He asked his next-door neighbors, Joel and Annette Sappingfield, "to keep an eye on his house" while he was away.

Around 2:30 p.m., the Sappingfields noticed a white utility pickup truck in Lucero's driveway.  Joel Sappingfield knocked on Lucero's back door three times over the span of two or three minutes.[2]  Finally, defendant answered the door.  He was wearing a neon orange vest.  A Hispanic man was behind him.

Sappingfield asked if Joe was there.  The Hispanic man said no.  The Hispanic man said they were cleaning the house for Joe.  This made Sappingfield suspicious, because he had offered to help Lucero clean his house, but Lucero had declined.

Sappingfield asked them for a work order or a business card.  Defendant said, "Let me go to the truck to get it."  He and the Hispanic man went to the truck and got in.  The truck drove off "[v]ery recklessly," hitting a fence and almost hitting the Sappingfields' truck.[3]  Annette Sappingfield called 911.  She gave the license number of the truck.

---

[2]      Sappingfield later told police the back door was open.

[3]      According to Annette Sappingfield, the Hispanic man was driving. According to Joel Sappingfield, however, defendant was driving.  When defendant took the stand, he admitted that he was driving.

3

A responding police officer found a cut padlock lying outside Lucero's back door. Later, Lucero found that approximately $3,000 was missing, along with a portable grill, hand tools, knives, hatchets, and medication.

The truck was registered to defendant at an address about a 10-minute drive away. Police officers went to that address. They spoke to Ashley Lockwood, who lived there. Defendant lived in a different house on the same property.

Lockwood led the officers to defendant's truck. It was not in defendant's usual parking space, which was visible from the street. Instead, it was parked in another location where he sometimes parked, "near the back of the property behind some dirt mounds." It had the license number that Annette Sappingfield had reported.

Lockwood also told the police that she had seen a brown Ford F-150 pickup truck, which she associated with a Hispanic man, at defendant's house earlier that day.

The officers then contacted defendant, who was raking in his front yard. They placed him in the back of a police car. He was cooperative. He told the police they could search his truck; however, they found it locked, and the keys were locked inside. A neon construction vest was visible in the back seat.

When the police asked, "Who's the guy in the brown truck?," he said it was his friend Rey Rodriguez. He told them how to find a house where Rodriguez lived (or perhaps used to live).

4

The police brought Joel Sappingfield to the scene. In an in-field showup, he identified defendant. The next day, in a photo line-up, Sappingfield identified Rey Rodriguez as the Hispanic man.

B.    *Defense Case*.

Defendant testified that he was an electrician. Rodriguez was a friend and occasional coworker. Rodriguez phoned defendant and asked for a ride; he gave what turned out to be Lucero's address. When defendant arrived, Rodriguez was in the front yard. Rodriguez asked him for an estimate to clean the yard. Defendant was not interested. Rodriguez then led defendant inside the house and asked for an estimate to clean the interior. Again, defendant was not interested. He did not think about taking anything; "Why would I take someone's trash?"

When Joel Sappingfield knocked, defendant answered the door within five seconds. Sappingfield was "very rude, very agitated." He asked for their identification. As defendant and Rodriguez started walking to the truck, Sappingfield said "Don't go anywhere. I'm getting my gun."[4]

Rodriguez said, "Let's get out of here. This isn't good." He added that "he couldn't have police contact" because "he had gang enhancement charges and weapons manufacturing charges." Defendant was scared, so he left and drove home. He started

---

[4]    At trial, Joel Sappingfield denied making any such threat. He did not even own a gun. At the preliminary hearing, he said he did not think he made the threat; however, after being asked "over and over again," he conceded, "It's possible."

raking his yard while Rodriguez walked out to the street; a woman came and picked Rodriguez up.

About five minutes after defendant got home, the police arrived. Because it was April 1, he thought at first that he was the victim of an April Fool's prank. He told the police, falsely, that he was never at Lucero's house, because he was afraid of them and afraid of Rodriguez. However, he admitted that, despite his supposed fear of Rodriguez, he did tell them where Rodriguez lived. Defendant claimed that he also told police that a man (i.e., Sappingfield) had threatened him, but "none of that made it on the record."

C. *Prosecution Rebuttal*.

On rebuttal, a video of defendant's statement to the police was played. After being given *Miranda* warnings, he denied being on High Street that day. He said he had been driving around looking for his girlfriend, but on Brookside Avenue, not on High Street. He denied having been with Rodriguez.

II

THE SUFFICIENCY OF THE EVIDENCE OF CRIMINAL INTENT

Defendant contends that there was insufficient evidence of criminal intent to support his conviction for burglary.

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the

6

defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court ""'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]' [Citation.]" (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

"Burglary is committed when a person 'enters any . . . building' with the intent of committing 'larceny or any felony.' [Citation.]" (*People v. Yarbrough* (2012) 54 Cal.4th 889, 890; see § 459.)

Essentially, defendant argues that the evidence was consistent with his testimony that he entered the house at Rodriguez's request, thinking that they both had the right to be there. The very premise of that testimony, however, was not credible. If Rodriguez was in the process of burglarizing a house, he might well phone defendant and ask for a ride. He would not, however, ask defendant how much he would charge to clean up the yard. And he certainly would not invite defendant inside the house and ask how much he would charge to clean it up. Rather, he would hop in defendant's truck and absquatulate.

Moreover, defendant's testimony does not account for the missing loot. Maybe Rodriguez could conceal the $3,000 and the medication on his person, but not the portable grill, hand tools, knives, and hatchets. For these to be missing, either defendant or Rodriguez had to load them into defendant's truck. Moreover, when they arrived at

7

defendant's house, either defendant or Rodriguez had to offload them. It is inconceivable that this could occur without defendant's knowledge.

Defendant claimed that Rodriguez walked out to the street; he saw a woman pick him up. If so, however, Rodriguez had to be carrying a portable grill, hand tools, knives, and hatchets — which defendant did not mention.

Defendant also did not credibly explain why he did not park in his usual parking space. He claimed he had the right to park there, and he did park there sometimes. On cross-examination, however, he was asked:

"Q. . . . So you parked at a place where it would take you 75 yards to get back to your own house . . . and . . . Rodriguez would have to cross an extra 75 yards to get back to the street?

"A. Yes, sir.

"Q. Any reason for that?

"A. No, sir."

Reasonable jurors could believe Joel Sappingfield's testimony that he did not threaten defendant and disbelieve defendant's testimony that Sappingfield did. On that view of the evidence, there was no credible explanation for why defendant drove away so hastily, hitting a fence and nearly hitting the Sappingfield's truck in the process — except that he had been caught flat-footed in the commission of a burglary.

Similarly, Sappingfield testified that he knocked on the door three times, over two or three minutes, before defendant answered. Defendant claimed that Sappingfield

8

knocked for only five seconds. Reasonable jurors could believe Sappingfield; hence, they could conclude that defendant's delay showed consciousness of guilt.

Defendant also contradicted himself about his movements after Rodriguez phoned him. On direct, he testified that Rodriguez phoned him around 11:30 a.m. At that time, defendant was practicing welding at a friend's house. He was wearing his neon work vest because he did not want to burn his shirt. He "stopped and went to go pick [Rodriguez] up." His apparent point was to explain why he was wearing the vest at Lucero's house; otherwise, a reasonable inference would be that he was trying to give the false impression that he was there to do legitimate work.

On cross, however, when confronted with the fact that he was at Lucero's house around 2:45 p.m., defendant corrected himself and said Rodriguez phoned him around 1:30 p.m.; he then further corrected that to 2:00 p.m. He added that he took some time to "clean up from welding." Apparently to explain why he did not take his vest off, despite admitting now that he cleaned up, he testified that he "normally drive[s] around with [his] vest on," "[e]ven when . . . not on the job."

On rebuttal, the prosecution introduced defendant's statement to the police, in which he said he had been driving around looking for his girlfriend. On surrebuttal, he claimed that that was true. "[T]hat [was the] hour you couldn't account for earlier." After Rodriguez phoned, defendant drove around looking for his girlfriend for an hour, "[g]ive or take," before actually going to pick Rodriguez up. Nevertheless, Rodriguez did not phone him during this time.

9

In short, defendant was destroyed on cross.

Last but not least, defendant was impeached by his statements to the police. The jurors could reason that an innocent man would have told the police the same story to which he eventually testified. Defendant claimed that he was afraid of Rodriguez; nevertheless, he admittedly gave the police Rodriguez's name and "told them where to find Rey."

For these reasons, there was substantial evidence that defendant knew he was not supposed to be in Lucero's house and that he entered it with the intent to steal Lucero's stuff.

III

THE ADMISSIBILITY UNDER *MIRANDA* AND *SEIBERT*

OF DEFENDANT'S STATEMENTS TO THE POLICE

Defendant contends that the police failed to give him *Miranda* warnings before they initially questioned him. Also, while they did eventually give him *Miranda* warnings before they questioned him further, such "midstream *Miranda* warnings" are ineffective. Therefore, the trial court erred by admitting his responses to both the pre- and post-*Miranda* questioning.

A.     *Additional Factual Background.*

The trial court held an Evidence Code section 402 hearing. The evidence at that hearing showed the following.

10

Defendant was a suspect because a truck registered to him had been identified as involved in the crime and was found at his home.

Deputy Robert Ochoa and a second officer contacted defendant, detained him, and put him in the back of a police car. Defendant was not handcuffed, but he was locked in. The purpose of the detention was to hold him while a witness (i.e., Joel Sappingfield) was brought for an in-field show-up.

While they were waiting, Deputy Ochoa "asked him who his friend was that drives the brown truck." He said that was his friend Rey. Deputy Ochoa asked where Rey lived. Defendant said he did not know the address, but he explained how to get there and how to identify the house.

Deputy Ernesto Elenes brought the witness to the scene. Once the witness identified defendant,[5] Deputy Elenes handcuffed defendant and told him he was under arrest. Deputy Elenes drove the witness home, then drove back to the scene; this took about 30 minutes. He gave defendant *Miranda* warnings, and defendant agreed to talk to him.

B.    *Additional Procedural Background*.

Defendant filed a motion to exclude his statements to the police, based on *Miranda*. He argued that, once he was handcuffed and put in the police car, he was in

---

[5]    Deputy Elenes parked the witness about 200 yards from defendant, who was still in the police car. The witness could not see defendant well enough to make an identification. Deputy Elenes therefore walked to the police car, took a photo of defendant, and showed it to the witness, who then identified him.

11

custody and entitled to *Miranda* warnings. He also argued that, under *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*), "*Miranda* warnings given mid-interrogation, after a defendant gives an unwarned confession, are ineffective . . . ."

The prosecution filed an opposition. It argued that defendant "was briefly detained for the purpose of an identification . . . ." It also argued that the evidence did not show the kind of two-step interrogation prohibited by *Seibert*.

After hearing argument, the trial court denied the motion. It explained: "While I can see there being some parallels to the *Seibert* case, I think there's also some differences that are distinguishable. The pre-*Miranda* statements came in, it was not even accusations of what it was that they were thinking Mr. Roller had — the crime he had committed. They're asking about [Rodriguez's] truck. That changed after defendant was identified by the witnesses in this case, and he was appropriately given his *Miranda* rights and he waived them and made statements."

C.    *Discussion*.

"[W]hen an individual is taken into custody . . . [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda*, *supra*, 384 U.S. at pp. 478-479.) "Statements taken in violation of *Miranda* are inadmissible in the government's case-in-chief." (*People v. Caro* (2019) 7 Cal.5th 463, 492.)

12

"On review, '"we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*."' [Citations.]" (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.)

"*Miranda* warnings are due only when a suspect interrogated by the police is 'in custody.'" (*Thompson v. Keohane* (1995) 516 U.S. 99, 102.) "Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation. [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 395.)

The fact that defendant was not free to leave, standing alone, is not determinative. In an investigative detention (also known as an investigative stop or a *Terry* stop; see *Terry v. Ohio* (1968) 392 U.S. 1), the suspect is not free to leave but nevertheless is not in custody for purposes of *Miranda*.

"Under the Fourth Amendment, . . . a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.' [Citation.] '[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation."' [Citation.] Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or

dispelling the officer's suspicions.  But the detainee is not obliged to respond.  And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 439-440, fns. omitted.)  In light of "[t]he comparatively nonthreatening character of detentions of this sort," "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." (*Berkemer* at p. 440; accord, *Howes v. Fields* (2012) 565 U.S. 499, 510; *Maryland v. Shatzer* (2010) 559 U.S. 98, 113; *People v. Clair* (1992) 2 Cal.4th 629, 679 ["Generally, [custody] does not include a temporary detention for investigation."]; but see *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1405-1406.)

"'[T]here is no hard and fast line to distinguish . . . investigative detentions from . . . *de facto* arrests.  Instead, the issue is decided on the facts of each case, with focus on whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances.' [Citations.]  Important to this assessment, however, are the 'duration, scope and purpose' of the stop. [Citation.]" (*People v. Celis* (2004) 33 Cal.4th 667, 674-675.)

Except in one respect, *People v. Craig* (1978) 86 Cal.App.3d 905 (*Craig*) is on all fours with this case.  (Perhaps we should say it is on all threes.)  There, officers placed several robbery suspects in the back of the police car.  The robbery victim was brought to the scene.  He identified two of the suspects (including defendants Craig and Turner).  All of the suspects were then taken to the police station.  (*Id*. at p. 911.)

14

The *Craig* court relied on *People v. Harris* (1975) 15 Cal.3d 384. *Harris* had held that, under the circumstances there, transporting the defendant to the scene of the crime to see if a witness could identify him was unconstitutional, in part because there were less intrusive means, such as transporting the witness to where the defendant was. (*Craig*, *supra*, 86 Cal.App.3d. at p. 912.)

*Craig* went on: "The facts and circumstances here fit squarely within the suggested alternative of *Harris*. Implicit in that decision is the belief of the Supreme Court in the right of officers to detain a suspect for a reasonable period of time for identification. Accordingly, we hold the officers' detention of defendants, for the purpose of identification by the victim was reasonable where the period of detention was only a few minutes (5-10), and the victim was brought to the suspect. It was proper, under the circumstances, for defendants to be held inside a police vehicle while awaiting the victim. If *Harris* would allow transportation of a suspect in a police vehicle, the similar placement of a suspect in a police vehicle would not, in our view, be improper where the vehicle is immobile." (*Craig*, *supra*, 86 Cal.App.3d at p. 913.)

*Craig* is distinguishable only in that there, the detention lasted five to ten minutes, whereas here, it was somewhat longer. When Deputy Elenes *Mirandized* him, defendant had been in the police car for about an hour. However, this included the 30 minutes that it took Deputy Elenes to drive Sappingfield home after he identified defendant. After the identification, the police had probable cause for an arrest. Moreover, they did not question defendant during this time. The relevant investigative detention was between

15

the time when defendant was placed in the police car and the time when Sappingfield identified him. This lasted about 30 minutes.

Similarly long seizures for the purpose of identification have been held to be investigative detentions.

In *People v. Bowen* (1987) 195 Cal.App.3d 269, two suspects were handcuffed to a guard rail for 25 minutes while the victim was brought to the scene for an identification. (*Id*. at pp. 271-273.) The appellate court rejected the defendant's contention that this was a *de facto* arrest. (*Id*. at pp. 272-274.) "[T]he police officers immediately radioed their dispatcher to request that the victim be transported to the detention scene . . . . The police tape contains a recording of [an officer] asking for an estimation of the time of arrival of the victim. The dispatcher radioed back that the unit transporting the victim was caught in traffic and would arrive shortly." (*Id*. at pp. 273-274.) "Since the 'police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant' [citation], the 25-minute detention was not unreasonable and did not amount to an arrest. [¶] The fact that appellant was handcuffed while detained awaiting the victim's arrival does not mean that appellant was under arrest during this time. . . . [As in] *Craig*, the officers in the instant case properly secured appellant while awaiting the victim." (*Id*. at p. 274.)

In *In re Carlos M.* (1990) 220 Cal.App.3d 372, after a reported rape, an officer "awakened two sleeping suspects; got them on their feet; attempted to obtain names and identifications; determined a language barrier existed and that they lacked identifications;

16

called to determine the location of the only person (i.e., the victim) who could confirm or dispel his suspicions; conducted a pat-down search; handcuffed both suspects; walked them to his car and placed them inside; made a five-minute trip to the hospital [where he victim was]; and walked two men, one at a time, to the place where the victim could identify them." (*Id*. at p. 382, fn. 4; see also *id*. at pp. 380-381.)

The appellate court held that this was a reasonable investigative detention and not a *de facto* arrest. (*In re Carlos M.*, *supra*, 220 Cal.App.3d at pp. 381-385.) The officer "selected 'a means of investigation that was likely to confirm or dispel [his] suspicions quickly.' [Citation.]" (*Id*. at p. 385.) The detention was not "impermissibly lengthy"; considering everything the officer accomplished in 30 minutes, his "actions show[ed] commendable dispatch." (*Id*. at p. 382, fn. 4.) It was necessary to transport the defendant to the hospital, because the victim could not be brought to the scene until her rape examination was over, which would have prolonged the detention. (*Id*. at pp. 383-384.) Finally, it was necessary to handcuff both men for officer safety. (*Id*. at p. 385; see also *People v. Soun* (1995) 34 Cal.App.4th 1499, 1515-1520 [35-minute detention in back of police cars so arresting officers could determine whether detainees matched witness descriptions].)

A 24-hour seizure might be an arrest per se; a 30-minute seizure is not. Thus, we look to whether the police "'diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances.' [Citations.]" (*People v. Celis*, *supra*, 33

Cal.4th at p. 675.)  Here, it took about 30 minutes to go from defendant's house to the witness's house and back.  Thus, it appears that the police acted diligently and expeditiously.

Because defendant was subject to an investigative detention, he was not in custody, so Deputy Ochoa could properly question him without *Miranda* warnings.  And, once the witness identified him, Deputy Elenes could properly place him in custody, *Mirandize* him, and interrogate him; *Seibert* did not apply.

IV

INABILITY TO PAY FINES AND FEES

Defendant contends that, because the trial court found that he was not able to pay certain fees, it erred by imposing other fees and fines.

A.     *Additional Factual and Procedural Background.*

The trial court found that defendant did not have the ability to pay a presentence report fee (§ 1203.1b, subd. (a)) or presentence incarceration costs (§ 1203.1c).  However, it did impose a $300 restitution fine (§ 1202.4), a $300 parole restitution revocation fine, stayed (§ 1202.45), a criminal conviction fee of $30 (Gov. Code, § 70373), and a court operations assessment fee of $40 (§ 1465.8).

At first, the trial court was going to impose a booking fee  (Gov. Code § 29550.2) of $514.48.  Defense counsel asked it to "stay" the booking fee, invoking *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).  The trial court agreed to do so, although it observed, "I'm not sure *Dueñas* is the proper vehicle for that."

18

B.      *Discussion.*

*Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

Buckets of ink have been spilled over whether *Dueñas* is good law, including the subsidiary question of whether, even assuming it reached the right result, it should have analyzed the issue under the excessive fines clause rather than the due process clause. These issues are presently before our Supreme Court.  (See *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)  As we find we can resolve this contention on other grounds, we express no opinion on them.

1.      *Forfeiture*.

The People respond that defense counsel forfeited this contention by failing to object to any of the fines or fees other than the booking fee.

We agree.  When, as here, the defendant was sentenced after *Dueñas*, we apply the general rule that failure to object results in forfeiture.  (*People v. Torres* (2020) 47 Cal.App.5th 984, 991; see generally *People v. Scott* (1994) 9 Cal.4th 331, 353.)  Defense counsel chose to object only to the booking fee, and the trial court agreed not to impose it.  Defendant does not claim that this was ineffective assistance.

2.      *Prejudice*.

The People also respond that the asserted error was harmless.

Again, we agree.  In *People v. Jones* (2019) 36 Cal.App.5th 1028, we held that a *Dueñas* error is harmless when the record demonstrates that the defendant could not have shown inability to pay.  (*Id*. at p. 1035.)  In that case, it was clear that the defendant could pay the fines out of his prison wages; therefore, the error was harmless.  (*Ibid*.)

Here, defendant will not necessarily be able to pay the full $370 out of prison wages.  However, he should be able to make a dent in it.[6]  Moreover, the probation report shows that he had a high school diploma.  He worked as an electrician, landscaper, and home remodeler, making $1,500 a month.  He had fixed expenses of $750 a month, leaving him with disposable income of $750.  He was 36 years old  and in good health.  It seems indisputable that he can pay $370 once he gets out of prison.  Indeed, we question the support for the trial court's finding that he could *not* pay those fees that it *declined* to impose.

---

[6]    Defendant was sentenced to four years.  With good conduct credits (§ 2933, subd. (b)), he would have to serve only two years.  In addition, he had 84 days — a little under three months — of presentence custody credit.  This left him facing actual incarceration of a little over 21 months.  If he worked, he could earn a minimum of $5.40 a month (see *People v. Taylor* (2019) 43 Cal.App.5th 390, 402), for a minimum total of $113.40.

V

DISPOSITION

The judgment appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

MILLER
J.

SLOUGH
J.

21